**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ROBERT J. DARRETTA and
MARYELLEN DARRETTA,

     Plaintiffs,

v.

WINDSOR PROPERTIES, a Florida
general partnership, and
TORWEST, INC., a Florida corporation,
as general partner of WINDSOR PROPERTIES,

     Defendants.

_____/

CASE  04-14244

## COMPLAINT

    The plaintiffs, Robert J. Darretta and Maryellen Darretta, sue the defendants, Windsor Properties and Torwest, Inc, the general partner of Windsor Properties, and allege as follows:

    1.    This is an action for specific performance to direct the defendants to approve the plaintiffs' architectural plans for construction of a home on real property the plaintiffs own in Vero Beach, Florida, and for breach of the contract between the parties, and for appointment of a special master.

### THE PARTIES

    2.    The plaintiffs Robert J. Darretta and Maryellen Darretta, husband and wife, are citizens of the State of New Jersey, who own the real property in Vero Beach, Florida upon which they wish to build a home.

    3.    The defendant, Windsor Properties, is a Florida general partnership having its principal place of business at 3125 Windsor Boulevard, Vero Beach, Florida 32963.

4.     The defendant, Torwest, Inc., a Florida corporation also having its principal place of business at 3125 Windsor Boulevard, Vero Beach, Florida 32963, is the general partner of Windsor Properties.

## JURISDICTION AND VENUE

5.     The court has original jurisdiction of this action, pursuant to 28 U.S.C. §1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.     The Court has personal jurisdiction of the defendants because they maintain an office and conduct business within the district.

7.     Venue is proper, pursuant to 28 U.S.C. § 1391(a), because all of defendants' acts or omissions occurred within the district, the defendants reside within the district, and the real property owned by the plaintiffs is located within the district.

## GENERAL ALLEGATIONS

8.     On or about April 7, 2002, the parties entered into two lot purchase agreements (collectively, the "Agreement") for the purchase of real property described as Lot 1 and Lot 2, Block 15, WINDSOR PHASE 1 PD, recorded in Plat Book 13, Page 51, of the Public Records of Indian River County, Florida (the "Property").  The Agreement is annexed as exhibit 1.

9.     Closing occurred on or about July 11, 2002.  The purchase price of the Property was $1,000,000.  The Property is located in a residential community known as Windsor.

10.     The Agreement provides that the plaintiffs were to begin construction of a single-family residential home on the Property within 24 months after closing on the Property.

2

11. The Agreement incorporates the Declaration of Covenants, Conditions, and Restrictions for Windsor, and states that the architectural plan approval procedure for the building of homes in Windsor must comply with The Windsor Code (the "Code").

12. The Code was promulgated by the Windsor Architectural Review Committee ("WARC"), and contains a compilation of developer-created standards and guidelines that describe the style of homes that can be build in Windsor. The WARC was established by the defendants and operates under the control of the defendants as the defendants' agent. A copy of the Code is annexed as exhibit 2.

13. After closing on the Property, the plaintiffs scheduled various meetings with architects to design their home.

14. The Agreement and the Code required the plaintiffs to meet with the Windsor Town Planner for a pre-design, Code review before starting the designing and planning process. In compliance, the plaintiffs met with the Windsor Town Planner on or about February 4, 2003 to review the Code, to discuss pre-design of the home, and to discuss their selection process for architects.

15. After the meeting, the plaintiffs hired Jorge Hernandez, whom the defendants list as an approved architect, to build homes in Windsor. Mr. Hernandez had previously designed the tennis center at Windsor, which has been built, and he had a working relationship with the Town Planner of Windsor.

16. The Agreement and the Code require the plaintiffs to submit their proposed architectural plans for their home to the WARC at different stages of review for approval by the defendants prior to commencement of construction of their home.

17.    The WARC is required promptly to approve submitted architectural plans, or to allow the plaintiffs to revise and resubmit the architectural plans until they are approved.

18.    On or about September 29, 2003, the plaintiffs submitted the architectural plans for their home to the WARC for approval.

19.    More than six weeks passed until, on or about November 14, 2003, the plaintiffs received a letter from the WARC denying the architectural plans and suggesting resubmission of the architectural plans with changes.

20.    The plaintiffs and their architect contacted the chairman of the WARC, Mr. Luis Van Cotthem, and had several discussions in which they were instructed by Mr. Van Cotthem to make certain changes that he said would provide the WARC to approve the architectural plans.

21.    On or about December 18, 2003, and after considering the WARC's November 14 letter and incorporating Mr. Van Cotthem's instructions into the plans, the plaintiffs re-submitted modified architectural plans to the WARC for approval.

22.    After the plaintiffs submitted the modified architectural plans, Mr. Van Cotthem contacted the plaintiffs' architect, Mr. Hernandez, and requested a meeting to discuss some additional changes Mr. Van Gotthem felt were needed to be made in order for the WARC to approve the plaintiffs' architectural plans.  During the meeting, Mr. Van Cotthem gave Mr. Hernandez instructions that were inconsistent with and contradictory to the earlier instructions Mr. Van Gotthem had given to the plaintiffs and Mr. Hernandez.  At the end of the meeting, Mr. Van Cotthem assured Mr. Hernandez that the plaintiffs' architectural plans would be satisfactory if they incorporated the changes he described.

23.    The plaintiffs delivered re-modified architectural plans with the changes requested by Mr. Van Cotthem on or about January 12, 2003 to the WARC.

24.     On or about January 22, 2003, the plaintiffs traveled to Vero Beach to start interviewing prospective builders for their home.  While in Vero Beach, the plaintiffs learned that Mr. Van Cotthem had not responded in writing with an approval (or criticism) of the architectural plans but, instead, had verbally disapproved the architectural plans.  The plaintiffs immediately contacted the defendants to seek assistance with overcoming the inconsistent and contradictory instructions the plaintiffs were receiving in the approval process.

25.     The next day, January 23, 2003, the plaintiffs, Mr. Van Cotthem, and Mr. Hernandez met at Windsor to discuss the plaintiffs' architectural plans.  During the meeting, the plaintiffs expressed concern regarding the inconsistent and contradictory instructions received from Mr. Van Cotthem, and noted that the inconsistent directives were causing substantial delay in the commencement of the construction of their home.  Mr. Van Cotthem assured the plaintiffs that the delays were typical because the WARC must be involved in the plan approval process.  Mr. Van Cotthem agreed to achieve final resolution for the plaintiffs' architectural plans, and the plaintiffs stated they would gladly return to Vero Beach for the next WARC meeting, which was scheduled for February 12, 2004, to resolve any and all remaining issues.

26.     After the January 23 meeting at Windsor, the plaintiffs again contacted the defendants and requested their assistance with the plan approval process.

27.     Two weeks later, on or about February 5, 2004, the plaintiffs sent a letter to the WARC and to the defendants requesting approval of the plaintiffs' architectural plans incorporating Mr. Van Cotthem's most recent suggested changes.

28.     Mr. Van Cotthem told the plaintiffs late on February 11, 2004, -- the evening before the WARC meeting -- that the plaintiffs and Mr. Hernandez would not be allowed to attend the meeting.

29.     After the WARC meeting, the WARC sent a letter to the plaintiffs on or about February 13, 2004, denying approval of the architectural plans.  In response, the plaintiffs and Mr. Hernandez contacted Mr. Van Cotthem to discuss the new items raised, in order to obtain approval of the plaintiffs' architectural plans for their home.

30.     After incorporating the proposed changes, Mr. Hernandez contacted the WARC on February 17, 2004, to follow up and seek confirmation of approval of the architectural plans.

31.     On March 4, 2004, the WARC sent a letter to the plaintiffs denying approval of the architectural plans.

32.     During the next two months, Mr. Hernandez engaged in several discussions with Mr. Van Cotthem regarding the plaintiffs' architectural plans and the new changes the WARC wanted before it would approve the plans.  During those discussions, Mr. Van Cotthem instructed Mr. Hernandez on the requested changes, and, on or about May 20, 2004, the plaintiffs resubmitted their again modified architectural plans to the WARC for approval.

33.     Nearly three weeks later, on June 8, 2004, the WARC sent a letter to the plaintiffs denying approval of the architectural plans.

34.     In response, on June 25, 2004, Mr. Hernandez submitted a line-by-line response to the WARC's June 8 denial, and showed in detail, how the plaintiffs existing architectural plans had complied with the Code and instructions of WARC, Mr. Van Cotthem, and the defendants.   The June 25, 2004 architectural plan submission is annexed as exhibit 3 (composite).

35.     Nearly three weeks later, not having heard any response from any of the defendants, Mr. Van Cotthem, or the WARC, the plaintiffs contacted the WARC on or about July 13, 2004, asking of the status of the approval of the architectural plans.  According to the

WARC, the approval of the plaintiffs' architectural plans was "delayed" because five other sets of architectural plans were also pending approval.

36.     After passage of another week without receiving any response from the defendants, the plaintiffs called the defendants and left telephone messages on July 22, July 23, and July 26, 2004. No one returned any of the telephone calls.

37.     On July 27, 2004, the plaintiffs received a letter, by certified mail, from the defendants demanding the plaintiffs to convey their Property to the defendants, purportedly because construction had not commenced within 24 months of closing.

38.     The plaintiffs wrote to the defendants on August 3, 2004, requesting the defendants to withdraw their demand and asking for fair treatment during the approval process. The plaintiffs also requested a response to their architectural plan submission of June 25, 2004 so they could make whatever new changes the WARC now wanted. The plaintiffs' architectural plans had been pending approval by the defendants and the WARC for five weeks, with no written response.

39.     As of the filing of this action, the defendants and the WARC have not approved the June 25, 2004 architectural plans submitted by the plaintiffs, and the defendants have not withdrawn their demand.

40.     But for the unreasonable delays caused by the defendants and the defendants' unreasonable disapprovals of the plaintiffs' architectural plans, the plaintiffs would have commenced construction of their home within 24 months of purchasing the Property.

41.     All conditions precedent to the filing of this action have been satisfied or waived.

42.     Pursuant to the Agreement, the plaintiffs will be entitled to recover their attorneys' fees for this action. The plaintiffs have engaged the law firm of Gunster, Yoakley & Stewart P.A. to prosecute this action, and have agreed to pay their lawyers a reasonable fee.

**COUNT ONE**
**SPECIFIC PERFORMANCE**

43.     The plaintiffs reallege paragraphs 1 through 41.

44.     This is an action for specific performance of the Agreement.

45.     The Agreement is a valid and enforceable contract between the parties, and contains the procedures requiring approval of the plaintiffs' architectural plans for their home. The Code further explains and supplements the Agreement's procedures.

46.     The plaintiffs have substantially performed under the Agreement.

47.     The plaintiffs' June 25, 2004 architectural plan submission substantially complies with the terms of the Agreement and the Code.

48.     The defendants have failed to comply with the terms of the Agreement because they have failed to exercise reasonable diligence and promptness with respect to the plaintiffs' architectural plans, and have been unreasonable in their refusal to approve the architectural plans as required by the Agreement.

49.     Because the defendants have failed and refused to approve the plaintiffs' architectural plans for their home, the plaintiffs are entitled to specific performance of the terms of the Agreement.

50.     The plaintiffs are ready, willing, and able to complete performance of the terms of the Agreement.

WHEREFORE, the plaintiffs, Robert J. Darretta and Maryellen Darretta, respectfully request that judgment be entered: (a) requiring specific performance by the defendants of the

terms of the Agreement, in accordance with a reasonable application of the Code, including but not limited to approving the plaintiffs' architectural plans for their home; (b) appointing a special master, pursuant to Federal Rule of Civil Procedure 53(a)(1)(C) or other applicable provision, to oversee and supervise the defendants and its architectural review committee during the performance of the Agreement, and to address any matters that may arise relating to the review of the plaintiffs' architectural plans and the construction of their home; (c) retaining jurisdiction to enter any further orders or judgments relating to the rights, duties, and obligations of the parties concerning any decision of the special master, or to consider appeals from decisions of the special master; (d) awarding the plaintiffs their attorneys' fees and costs; and (e) awarding the plaintiffs such other relief as the court deems just and proper.

**COUNT TWO**
**BREACH OF CONTRACT**

51.     The plaintiffs reallege paragraphs 1 through 42.

52.     The Agreement is a valid and enforceable contract between the parties.

53.     Pursuant to the Agreement, the defendants have a duty to act with reasonableness, promptness, and diligence with respect to the plaintiffs' architectural plan submissions, and the defendants have a duty to approve the architectural plans submitted by the plaintiffs for their home.

54.     The defendants also owe the plaintiffs a duty of good faith and fair dealing during the architectural plan approval process.  The defendants owe the plaintiffs a duty to perform under the Agreement and the Code in good faith and in a manner that will protect the plaintiffs' reasonable expectations under the Agreement and the Code.

55.     The plaintiffs' June 25, 2004 architectural plan submission substantially complies with the Agreement and the terms of the Code.

9

56.     The defendants have failed to act with reasonable diligence and promptness in respect of the plaintiffs' architectural plans and have failed and refused to approve the plans pursuant to the Agreement.

57.     By failing to exercise reasonable diligence and promptness during the architectural plan approval process and by failing to approve plaintiffs' June 25, 2004 architectural plans, the defendants have breached the Agreement and their duty of good faith and fair dealing.

58.     The breach has caused the plaintiffs to suffer damages, including special damages such as extraordinary architectural fees, unnecessary travel expenses, and other unwarranted expenses.

WHEREFORE, the plaintiffs, Robert J. Darretta and Maryellen Darretta, respectfully request that judgment be entered against the defendants for damages, including special damages, and for attorneys' fees and costs, and for such other relief as the court deems just and proper.

Dated:  August 27, 2004                     Respectfully submitted,

                                            GUNSTER, YOAKLEY & STEWART, P.A.
                                              Counsel for Plaintiffs
                                            777 South Flagler Drive
                                            Suite 500 East
                                            West Palm Beach, Florida 33401
                                            Tel. (561) 655-1980
                                            Fax (561) 655-5677


                                            By: _____
                                              JOHN F. MARIANI
                                              Florida Bar No. 263524
                                              jmariani@gunster.com

                                              DANIEL A. THOMAS
                                              Florida Bar No. 0168262
                                              dthomas@gunster.com

# EXHIBIT 1

## WINDSOR
## LOT PURCHASE AGREEMENT

THIS AGREEMENT is entered into on the date set forth below by and between **WINDSOR PROPERTIES**, a Florida general partnership ("Seller"), whose address is 3125 Windsor Boulevard, Vero Beach, Florida 32963, which agrees to sell, and **Robert J. Darretta, Jr. and Mary Ellen Daretta (FREC Reg** (Purchaser"), who presently resides at **11 Oak Ridge Court, Princeton, NJ 08540                ,** telephone; **609-497-9339,** social security number(s) **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,** who agrees to purchase, the following escribed real property in accordance with the terms and conditions of this Agreement:

Lot **1**, Block **15**, (Parcel ____, Block _____, per Exhibit "C"), as shown on WINDSOR PLAT NO. **1**, recorded in Plat Book **13**, Page **51**, of the public records of Indian River County, Florida, ("Lot") together with all rights, memberships and appurtenances thereto and all improvements and fixtures, if any, located thereon. The Lot is part of the residential community known as Windsor and is subject to that certain Declaration of Covenants, Conditions, and Restrictions for Windsor ("Declaration") recorded in Official Records Book 886, Page 6, of the public records of Indian River County, Florida, the By-Laws of Windsor Community Association, Inc. ("By-Laws") which is an exhibit to the Declaration, and the Articles of Incorporation of Windsor Community Association, Inc., filed with the Secretary of State of the State of Florida.

The Lot has a street address of            **3130 Savannah Place, Vero Beach, Florida 32963**

1.     **PURCHASE PRICE.**

(a)     **General.** The purchase price for the Lot ("Purchase Price") shall be **$ 495,000.00** and shall be payable by Purchaser to Seller as follows:

|  |  |
|---|---|
| (i)     Initial deposit held in escrow by O'Haire, Quinn & Candler, Chartered | **$     5,000.00** |
| (ii)     Ten (10%) percent of the Purchase Price shall be due **10 days after Effective Date.** | **$    44,500.00** |
| (iii)     Balance of the Purchase Price, not including closing costs which are the responsibility of Purchaser under Section 3 of Exhibit "A" to this Agreement, due at Closing | **$    445,500.00** |
| TOTAL PURCHASE PRICE: | **$    495,000.00** |

(b) **Earnest Money.**   The parties acknowledge and agree that the earnest money deposit ("Earnest Money") shall be placed in an interest-bearing escrow account and shall be applied to the purchase price at Closing. All interest earned on the Earnest Money, except in the event of Purchaser's default under this Agreement as provided in Section 9 shall be credited to Purchaser at Closing.

(c) **Form of Payment.** All amounts due hereunder shall be paid in United States Dollars by certified or cashier's check drawn on a local Vero Beach, Florida bank, or by electronic or wire transfer, or in such other form as is acceptable to Seller.

2.     **TIME FOR ACCEPTANCE; EFFECTIVE DATE; FACSIMILE:** If this offer is not executed by and delivered to all parties **OR FACT OF EXECUTION** communicated in writing between the parties on or before **April 11, 2002,** the deposit(s) will, at Buyer's option, be returned to Buyer and this offer withdrawn. A facsimile copy of this Contract for Sale and Purchase ("Contract") and any signature hereon shall be considered for all purposes as originals. The date of Contract ("Effective Date") will be the date when the last one of the Buyer and Seller has signed this offer.

3.     **CLOSING.** The closing of the purchase and sale of the Lot contemplated by this Agreement ("Closing") shall take place at the office of Seller's attorneys O'Haire, Quinn & Candler, 3111

1



Cardinal Drive, Vero Beach, Florida  32963 on a date not later than ~~June 11, 2004~~. Closing costs shall be paid by Purchaser and Seller as set forth in the Disclosures and Acknowledgments attached hereto and incorporated herein as Exhibit "A".

4.      **TITLE.**

(a)  **Title.**  At Closing, Seller shall convey good, marketable and insurable title to the Lot to Purchaser by general warranty deed, subject only to (i) matters approved or waived by Purchaser as provided below; (ii) current and future real property taxes and assessments; (iii) general utility and right-of-way easements serving the Lot; (iv) the zoning and land use ordinances of Indian River County, Florida; (v) any recorded covenants, conditions or restrictions encumbering the Lot, including the Declaration and the Supplemental Declaration (if any); (vi) any matters which would be disclosed by an accurate survey and inspection of the Lot; (vii) rights of Indian River County and the State of Florida; and (viii) standard title exceptions for property bounded by the Atlantic Ocean or the Indian River (to the extent (vii) and (viii) apply to the Lot).

(b)  **Title Insurance.**  At least twenty (20) days prior to the date of Closing, Seller shall deliver to Purchaser an owner's title insurance commitment showing that Seller is vested with title to the Lot, issued by a title insurance company selected by Seller and licensed in the State of Florida, for an ALTA owner's title insurance policy for the Lot.  The commitment shall provide for title insurance in the full amount of the Purchase Price and shall be subject only to the exceptions set forth in subsection 4(a) above which Purchaser by the execution of this Agreement specifically approves.  The policy shall be delivered to Purchaser after Closing.

5.      **POSSESSION.**  Unless otherwise agreed to by both parties in writing, possession of the Lot shall be delivered to Purchaser at Closing.

6.      **SUBDIVISION IMPROVEMENTS.**

(a)  **Incomplete Development.**  Purchaser acknowledges and recognizes that inasmuch as Purchaser may be purchasing the Lot during the period of construction and the Lot may be completed prior to the completion of other lots and streets in the Windsor community, there may be certain inconveniences until construction is completed, and Purchaser waives all claims with respect thereto. Purchaser agrees that if Purchaser, Purchaser's family, guests, employees, contractors, agents, or invitees enters onto any area of construction, they do so at their own risk, and neither Seller, nor Seller's contractors, agents or employees shall be liable for any damage, loss or injury to such persons.

(b)  **Repairs to Subdivision Improvements.**  Purchaser agrees to use Purchaser's best efforts to avoid altering or causing damage to Seller's community and subdivision improvements, which include, but are not limited to paved streets and drainage, central water lines, central sewer lines, signage, landscaping, entry features and irrigation systems, during construction of Purchaser's residence and hereby assumes full responsibility for the cost of any maintenance and repair of community and subdivision improvements necessitated by Purchaser's activities or the activities of its contractors, subcontractors, or agents in the Windsor community.

(c)  **Water and Sewer Service.**  Purchaser shall, at Purchaser's expense, tap onto the central water and central sewer systems to obtain potable water and sewer services to the Lot and shall be responsible for any connection fees and monthly availability fees charged for potable water or sewer service.  Impact fees for sewer and potable water charged by local governmental entities have been prepaid by the Seller and are included in the Purchase Price of the Lot.  If non-potable water is provided by the Seller, Purchaser must connect to that system and there may be a tap-on fee to be paid by Purchaser as well as a monthly use fee.

7.      **WARRANTIES.**  Purchaser hereby acknowledges and affirms that, except for the warranties of title to be included in the deed of conveyance to the Lot and the obligation of Seller to provide Purchaser with a buildable Lot, Seller does not, by the execution and delivery of this Agreement, and Seller shall not, by the execution and delivery of any document or instrument executed and delivered in connection with the Closing, make any warranty, express or implied, of any kind or any nature whatsoever, with respect to the Lot and all such warranties are hereby disclaimed.  Without limiting the generality of the foregoing, SELLER MAKES, AND SHALL MAKE, NO EXPRESS OR IMPLIED WARRANTY AS TO THE MERCHANTABILITY, VALUE, QUALITY OR SALEABILITY OF THE LOT.

2

8.     **PURCHASER'S OBLIGATION TO IMPROVE LOT.**

(a)  Purchaser covenants and agrees to cause construction of a single-family residential home to begin on the Lot WITHIN TWENTY-FOUR (24) MONTHS AFTER CLOSING, and to cause such construction to be completed and a certificate of occupancy issued WITHIN EIGHTEEN (18) MONTHS of the date on which construction is begun.  Once construction is commenced on the Lot Purchaser shall diligently pursue construction of the home to completion and obtain a certificate of occupancy for the home.  Purchaser agrees, and the deed of conveyance to Purchaser shall provide, that if construction on the Lot shall not have been commenced within the required time period or if a certificate of occupancy shall not have been issued for the home within the required time period (which time periods may be extended by Seller by written notice from Seller delivered to Purchaser), then at any time within ninety (90) days after the expiration of such required time periods (plus any extension, if applicable), Seller shall have the right, by delivering to Purchaser or the owner of the Lot written notice of its intent to repurchase prior to the expiration of such ninety (90) day period, to require the conveyance written notice of its intent to repurchase prior to the expiration of such ninety (90) day period, to require the conveyance of the Lot to Seller or any third designated by Seller by general warranty deed (subject to the same exceptions to title set forth in the deed of conveyance to Purchaser and subject to standard and customary easements that do not hinder the use of, development of and/or construction of improvements upon the Lot or any portion thereof)   for a total consideration equal to the Purchase Price paid by Purchaser hereunder, together with Purchaser's actual cost of any improvements placed on the property but not including architectural fees, other professional fees and closing costs.  If Purchaser is so notified, the Lot shall be conveyed to Seller within thirty (30) days after the date of receipt of Seller's notice and, upon conveyance, Seller shall pay the owner the repurchase price in funds immediately available in Indian River County, Florida.  Real property taxes and assessments shall be prorated as of the date of such reconveyance in the manner provided in this Agreement.  If the title proposed to be conveyed to Seller is subject to any lien, encumbrance or other defect which is not permitted in this Section, Seller, in addition to all other rights and remedies which it may have at law or in equity, may remove any such lien, encumbrance or defect and deduct all costs and expenses incurred by Seller (including, but not limited to, attorney's fees) from the amount of the purchase price otherwise payable as provided in this Section.  The failure of Seller to give notice of its election to repurchase within the ninety (90) day time period provided above shall automatically terminate such right of repurchase.  Seller agrees that Purchaser shall be entitled to reasonable extensions of the time periods set forth above in the event of delays caused by Acts of God, material shortages, labor strikes, or similar conditions including delays caused by municipal government, beyond the control of Purchaser.

(b)  Upon the issuance of a certificate of occupancy for a home located on the Lot within the time period set forth above, the right to repurchase herein provided for shall terminate and Seller shall, upon receipt of written request from owner of the Lot, execute a release of such right to repurchase in recordable form.

(c)  For purposes of this Section, construction shall be deemed to have commenced only upon approval of plans for a single family residential home by the Architectural Review Committee of the Association, issuance of a building permit by Indian River County, Florida, and completion of the foundation of the residential dwelling on the Lot.  The deed of conveyance to Purchaser shall provide that this right to repurchase is subordinate to any first priority mortgage or deed to secure debt securing a bona fide construction loan on the Lot.

9.     **DEFAULT AND REMEDIES.**  In the event of Purchaser's default in the performance of any obligation or covenant under this Agreement prior to Closing or which prevents Closing from taking place as provided herein, Seller may elect to terminate this Agreement by written notice to Purchaser sent by certified mail, return receipt requested.  Purchaser shall have 30 days following receipt of such notice to cure the default claimed by Seller.  In the event Purchasers fail to cure the default claimed, seller may retain all monies paid by Purchaser to Seller hereunder, including accrued interest, if any, as Seller's full and complete liquidated damages for such default, the parties hereby acknowledging and agreeing that the amount of Seller's actual damages in such circumstance would be difficult, if not impossible, to determine.  The parties further agree that such amount is a reasonable estimate of damages and is not a penalty.  In the event of Purchaser's default in the performance of any obligation or covenant hereunder after Closing has taken place, Seller may avail itself of any and all remedies available to it at law or in equity.  If Seller defaults under this Agreement, Purchaser, at its election, may (a) avail itself of the equitable remedy of specific performance together with any other actual damages sustained by Purchaser; or (b) terminate this Agreement by written notice to Seller, whereupon Seller shall immediately refund to Purchaser all Earnest Money, and the parties shall be relieved of any further obligations hereunder.  In any action at law or in equity between the parties hereto occasioned by a default hereunder, the prevailing party shall be entitled to collect its reasonable attorney's fees actually incurred in the action from the non-prevailing party.

3

Received 07/29/2004 10:52 in 06:14 on line [4] for ADMINISTRATOR * Pg 5/11

**10.    GOVERNING LAW.** This Agreement, and all of the relationships between the parties hereto, shall be construed and interpreted in accordance with the laws of the State of Florida.

**11.    SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the parties' successors and assigns. Purchaser shall not assign this Agreement or any interest hereunder, in whole or in part, without the prior written consent of Seller, which consent may be withheld for any reason or for no reason. Any attempted assignment by Purchaser without Seller's prior approval shall be null and void. Seller may assign its rights and obligations hereunder without the approval or consent of Purchaser.

**12.    NOTICE.** Each notice or document (collectively referred to in this Section as "notice") required or permitted to be given hereunder must comply with the requirements of this Section. Each such notice shall be in writing and shall be delivered either by personally delivering it, delivering it by courier service, or by depositing it with the United States Postal Service or any official successor thereto, certified mail, return receipt requested, with adequate postage prepaid, addressed to the appropriate party (and marked to a particular individual's attention). The addresses of the parties to which notice is to be sent shall be those set forth on page one (1) of this Agreement. Either party may change such address by written notice to the other party designating the new address in accordance with this Section.

**13.    SEVERABILITY.** The provisions of this Agreement are intended to be independent, and in the event any provision hereof should be declared by a court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason whatsoever, such illegality, unenforceability, or invalidity shall not affect the remainder of this Agreement.

**14.    ENTIRE AGREEMENT.** This Agreement and the exhibits hereto contain the entire agreement between the parties hereto. No agent, representative, salesman, or officer of the parties hereto has any authority to make, or has made, any statements, agreements, or representations, either oral or in writing, express or implied, modifying, adding to, or changing the terms and conditions hereof, and neither party has relied upon any representations not set forth in this Agreement. No dealings between the parties or custom shall be permitted to contradict, add to, or modify the terms hereof. No waiver or amendment to the provisions hereof shall be effective unless in writing and signed by both parties.

**15.    NON-RECORDATION OF AGREEMENT.** The parties agree that neither this Agreement nor a copy of this Agreement shall ever be filed of record. If either party does so record, the other party may avail itself of any remedies available to it at law or in equity. There may be recorded, however, at Seller's option, a memorandum of agreement or similar document referencing this Agreement in the official records of Indian River County, Florida, providing record notice of the existence of this Agreement under Florida law.

**16.    SURVIVAL.** All provisions of this Agreement shall survive the Closing of the purchase and sale contemplated by this Agreement and shall not be merged into the deed of conveyance.

**17.    NO WAIVER.** Failure of either party to insist upon compliance with any provision hereof shall not constitute a waiver of the rights of such party to subsequently insist upon compliance with that provision or any other provision of this Agreement.

**18.    CAPTIONS AND GENDER.** The captions used herein are for convenience only and shall not be considered in the construction of the various provisions of this Agreement. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter genders, as appropriate.

**19.    COUNTERPARTS.** This Agreement may be executed in separate counterparts. It shall be fully executed when each party whose signature is required has signed at least one counterpart even though no one counterpart contains the signatures of all the parties.

**20.    LOCAL TIME.** All references to the time of day in this Agreement shall refer to the time of day in Vero Beach, Florida.

**21.    SPECIAL STIPULATIONS.** Special stipulations, if any, are set forth on an exhibit attached hereto and incorporated herein by this reference, and shall control over any contrary provisions in the body of this Agreement.

4

(a) Seller's Closing Costs.  At Closing, Seller shall pay the following:

22.    BROKER'S FEE: Each party warrants, acknowledges and agrees that no broker(s) or salesperson(s) other than Windsor Real Estate, Inc. and _N/A_ have ever been involved in this transaction as the Broker(s) of record for this transaction and agrees to pay Windsor Real Estate, Inc. [COMPLETE ONLY ONE] _N/A_ % of gross purchase price; OR $ _N/A_ , and agrees to pay the above co-broker _N/A_ % of gross purchase price; OR $ _N/A_ , as a brokerage commission.  Said brokerage commission shall be paid at time of closing this transaction.  If Buyer fails to perform and deposit(s) is retained, 50% thereof, but not exceeding the Broker's fee above provided, shall be paid Broker as full consideration for Broker's services, including costs expended by Broker, and the balance shall be paid to Seller.  If the transaction shall not close because of refusal or failure of Seller to perform, Seller shall pay the full fee to Broker on demand.  In any litigation arising out of the Contract concerning the Broker's fee, the prevailing party shall recover reasonable attorney's fees and costs.    Each party further agrees to indemnify and hold the other party harmless from and against any and all claims made by any other broker(s) or salesperson(s) seeking any commission or compensation for any loss, liability, costs or expense arising by, through or under said indemnifying party.    Such indemnification shall include reimbursement of any attorney's fees and costs, including those accruing from alternative dissolute resolution proceedings, trial and appellate proceedings, incurred as a result of such claims made or such lawsuits filed.  Seller is responsible for payment of compensation of the broker(s) named herein unless otherwise provided.

See Exhibits A, B, C, and D attached hereto and made a part hereof.

PURCHASER:

Robert J. Darretta, Jr.

Date Signed: 4/7/02

Mary Ellen Darretta

SELLER:

WINDSOR PROPERTIES, a Florida general partnership, By, Torwest, Inc., General Partner

By:

John A. Brough

Title:  President

Date Signed: 4/8/02

COOPERATING BROKER, IF ANY:

Company Name:

Selling Agent:

Address:

Telephone:

Purchaser's Initials

Rev. 7/19/00, 8/1/00

5

EXHIBIT "A"

### Disclosures and Acknowledgments

1.  **RESPA DISCLOSURE.** As required by the Real Estate Settlement Procedures Act of 1974, Purchaser acknowledges that Seller has not directly or indirectly required Purchaser, as a condition of sale, to purchase either a fee owner's or mortgagee's title insurance policy from any particular title company. Seller has advised Purchaser that it will purchase, at Seller's sole cost and expense, a fee owner's title insurance policy from the title company of its choosing. Seller also has advised Purchaser that if Purchaser does not wish Seller to purchase the title insurance policy from such company, Purchaser may elect to obtain such insurance from a company of Purchaser's choice and Purchaser shall pay, at Closing, the title insurance premium for such policy. In any event Seller shall provide the title commitment to Purchaser as provided in Section 4 of the Agreement.

2.  **COSTS AND PRORATIONS.** Except as otherwise specifically provided herein, Purchaser shall be responsible for all closing costs incurred by Purchaser and Seller shall be responsible for all closing costs incurred by Seller, including their respective attorneys' fees.

(a)  **Seller's Closing Costs.** At Closing, Seller shall pay the following:

(i)  all costs incident to the release of the Lot from existing mortgages and financing statements, if any;

(ii)  the cost of all documentary stamps which are required to be affixed to the deed of conveyance;

(iii)  the cost of an owner's policy of title insurance on the Lot.

(b)  **Purchaser's Closing Costs.** At Closing, Purchaser shall pay the following:

(i)  all recording fees, including the fee for recording the deed of conveyance; and

(ii)  all charges incident to any mortgage executed by Purchaser.

(c)  **Taxes and Assessments.** Taxes for the current year shall be prorated based on the current year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If closing occurs at a date when the current year's millage is not fixed, and current year's assessment is available, taxes will be prorated based upon such assessment and the prior year's millage. If current year's assessment is not available, then taxes will be prorated on the prior year's taxes. Either party has the right to have the taxes re-prorated after closing when actual tax bill for the year of closing is issued with due allowance made for maximum allowable discount.

(d)  **Common Expense Assessments.** The annual assessments, if any, levied by the Association against the Lot as provided in the Declaration shall be prorated as of the first day of the month following Closing. All installments of the assessment due and payable after the date of Closing shall be paid by Purchaser to the Association at such times and in such manner as provided by the Board of Directors of the Association. All other amounts assessed against the Lot by the Association shall be paid in accordance with the terms and provisions of the Declaration.

(e)  **Contribution to Working Capital.** At Closing, Purchaser shall pay a one-time contribution to the working capital of the Association, in the amount of the annual Common Assessment, the Neighborhood Assessment, if any, and the Block Assessment, if any, levied on the Lot which amount shall be in addition to, and not in lieu of, regular assessments thereafter coming due.

3.  **ROADS, WATER, SEWER, AND ELECTRICITY.**

(a)  As of the Effective Date of this Agreement the road on which the Lot is located or is to be located is completed, or is fully bonded by a bond or other surety acceptable to Indian River County, Florida in the full amount necessary to assure completion of the paved road. The Association is obligated under the Declaration to accept the road for maintenance. Purchaser acknowledges receipt of a good faith written estimate of the cost of maintaining the roads in the Windsor Community over the first

6



Received 07/29/    11:03 in 02:22 on line [4] for ADMINISTRA    * Pg 3/4
Jul 29 04 11:18a                                                                                   P.3

ten (10) years of ownership by the Association, which estimate is attached hereto and incorporated herein as Exhibit "B".

(b)   As of the date of Closing water and sewer lines shall be extended to the Lot and electric service shall be made available to the Lot, or Indian River County, Florida shall be obligated to install these utilities within one hundred eighty (180) days of the date of Closing.  Sewer service and potable water service will be provided by Indian River County, Florida.  If non-potable water is provided by Seller, Purchaser must connect to that system and there may be a tap-on fee to be paid by Purchaser.

**4.  PERSONAL INSPECTION OF LOT.**  Purchaser acknowledges that the Purchaser or his or her spouse has made a personal, on-the-lot inspection of the Lot prior to the execution of this Agreement.

**5.  PLAN APPROVAL.**

(a)  **Procedure.**  Purchaser acknowledges that the Declaration requires the approval of plans and additional information by the Windsor Architectural Review Committee ("WARC") of the Windsor Community Association, Inc. prior to the commencement of construction activities on the Lot and that the WARC may charge a reasonable fee for such review.  Prior to Purchaser commencing any plans for a dwelling on the Lot, Purchaser, Purchaser's architect and/or contractor shall meet with the WARC to review the Windsor Code (as that term is defined in the Declaration) promulgated by the WARC.  Prior to the Purchaser's applying for a building permit for the Lot, Purchaser shall submit to the WARC for approval the preliminary site plan, preliminary elevations, preliminary floor plans, and any other plans required by the Windsor Code promulgated by the WARC, for the construction to be done on the Lot ("Plans").  The WARC shall deliver notice to Purchaser of its approval or disapproval following receipt of the Plans.  In the event of disapproval, Purchaser shall revise and resubmit the Plans to the WARC and the same procedure provided above shall be followed and repeated until the Plans are approved in writing by the WARC.

(b)  **Modification to Plans.**  Purchaser shall submit to the WARC, and the WARC shall have the right to approve or disapprove, any and all modifications to the Plans.  The WARC shall deliver notice to Purchaser of its approval or disapproval promptly after receipt of notice of the modification.  Upon disapproval, the foregoing procedure shall be repeated until written approval is obtained.

(c)  **Construction.**  Purchaser shall cause all construction and development on the Lot to be performed substantially in accordance with the approved Plans.  All construction on the Lot shall be performed only by builders and contractors licensed by the appropriate governmental entity and approved by the WARC according to the guidelines and criteria for builders and contractors promulgated by the WARC.

(d)  **Encroachments.**  If any encroachment of the chimney or ground level steps of the home built on the Lot is constructed into rights-of-way within the Windsor community which is permitted by the WARC and Indian River County, Florida, then damage caused by such work within the utility easement areas shall be the responsibility of the Purchaser and Purchaser agrees to indemnify and hold harmless Seller and Indian River County, Florida from damage to such encroachments.

**6.  CLUB.**

(a)  **Disclaimer.**  A privately owned golf course, beach club, and related facilities, The Windsor Club, Inc. ("Club") will be located adjacent to and within the boundaries of the Windsor community.  No representations or warranties have been or are made by the Seller or any other person with regard to the continuing ownership of or use rights in the Club.  Purchaser acknowledges and understands that he/she does not acquire any interest in the Club by virtue of taking title to the Lot.  Purchaser acknowledges that neither Seller, Seller's agents, nor any other person has made any representation, either express or implied, that the Club is owned by or will become Common Area (as defined in the Declaration) of the Association, or any other owners association.

(b)  **Contingency.**  There is no obligation for Purchaser to apply for membership in the Club.  In the event that Purchaser elects to apply for membership in the Club and files an application for membership in the Club within thirty (30) days of the Effective Date of this Agreement then Purchaser's obligation to close the Sale of the Lot is contingent upon Purchaser receiving approval of his or her membership application for membership in the Club prior to the date of Closing.  If Purchaser has not obtained membership approval by the date of Closing then, at Purchaser's option and upon giving written notice to Seller, this Agreement shall terminate, all Earnest Money shall be refunded to Purchaser, and the parties shall have no further obligations under this Agreement.



**7. RADON DISCLOSURE.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Seller has not investigated to determine whether radon gas or other environmental pollutants are present on the Lot or in the Windsor community. Purchaser acknowledges that such conditions may exist and that Seller has not analyzed or verified the extent of any such environmental or health hazards that may affect the Lot.

**8. DISCLOSURE SUMMARY:**

A.    AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNER'S ASSOCIATION, AND YOU SHALL NOT EXECUTE THE CONTRACT UNTIL AFTER YOU HAVE READ THE FOLLOWING DISCLOSURE SUMMARY.

B.    THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

C.    YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION, WHICH ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

D.    YOUR FAILURE TO PAY THESE ASSESSMENTS COULD RESULT IN A LIEN ON YOUR PROPERTY.

E.    THERE IS NOT AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION.

F.    IN SOME CIRCUMSTANCES, THE RESTRICTIVE COVENANTS CAN BE AMENDED WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERS.

EXHIBIT "B"

**Estimate of Cost of
Maintaining Roads at Windsor**

The Windsor Community Association has accepted and is obligated to maintain the roads at Windsor. The cost of road maintenance will be paid by the Windsor Community Association, Inc. from the proceeds of assessments levied against each Lot as provided for in the Declaration of Covenants, Conditions and Restrictions for Windsor. The following is a good faith estimate of the cost of road maintenance over a 10 year period.

| Year | Length of Road (in Feet) | Estimated Cost Per Linear Ft. | Total Estimated Annual Cost |
|------|--------------------------|-------------------------------|-----------------------------|
| 1993 | 20,000 | $0.95 | $19,000 |
| 1994 | 25,000 | $0.95 | $23,750 |
| 1995 | 30,000 | $0.95 | $28,500 |
| 1996 | 35,000 | $0.95 | $33,250 |
| 1997 | 40,000 | $0.95 | $38,000 |
| 1998 | 40,000 | $0.95 | $38,000 |
| 1999 | 40,000 | $0.95 | $38,000 |
| 2000 | 40,000 | $0.95 | $38,000 |
| 2001 | 40,000 | $0.95 | $38,000 |
| 2002 | 40,000 | $0.95 | $38,000 |
| 2003 | 40,000 | $0.95 | $38,000 |

9

# ADDENDUM TO LOT PURCHASE AGREEMENT

This Addendum to that certain Windsor Lot Purchase Agreement by and between **WINDSOR PROPERTIES** , a Florida general partnership, the Seller and **Robert J. Darretta, Jr. and Mary Ellen Darretta (FREC Reg)**, the Purchaser.

Seller and Purchaser agree that the following special stipulations shall be made a part of the Windsor Contract for Sale and Purchase between them:

Seller agrees to pay Buyer, a Florida Licensed Real Estate Broker, in the amount of $24,750 which shall be reflected as a credit to Buyer on the settlement statement at time of closing.

**BUYER**

_____
Robert J. Darretta, Jr.

_____
Mary Ellen Darretta

Date: ___4- 7- 0 2___

**SELLER**

WINDSOR PROPERTIES, a Florida general partnership
By: Torwest, Inc., General Partner

By: _____
John A. Brough, President
Date: ___4\9\02___

## EXHIBIT "C"

### Parcel Legal Description

Parcel _____, Block _____, WINDSOR PHASE/PLAT __1__ PD, being more particularly described as follows:
Lot _1_, Block _15_, WINDSOR PHASE/PLAT __1__ PD, recorded in Plat Book ____13___, Page _51____, of the Public Records of Indian River County, Florida.

10

# WINDSOR
# LOT PURCHASE AGREEMENT

THIS AGREEMENT is entered into on the date set forth below by and between **WINDSOR PROPERTIES**, a Florida general partnership ("Seller"), whose address is 3125 Windsor Boulevard, Vero Beach, Florida 32963, which agrees to sell, and **Robert J. Darretta, Jr. and Mary Ellen Daretta (FREC Reg)** ("Purchaser"), who presently resides at **11 Oak Ridge Court, Princeton, NJ 08540**, telephone: **609-497-9339**, social security number(s) **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**, who agrees to purchase, the following escribed real property in accordance with the terms and conditions of this Agreement:

Lot **2**, Block **15**, (Parcel ____, Block _____, per Exhibit "C"), as shown on WINDSOR PLAT NO. **1** ____, recorded in Plat Book **13**, Page **51**, of the public records of Indian River County, Florida, ("Lot") together with all rights, memberships and appurtenances thereto and all improvements and fixtures, if any, located thereon. The Lot is part of the residential community known as Windsor and is subject to that certain Declaration of Covenants, Conditions, and Restrictions for Windsor ("Declaration") recorded in Official Records Book 886, Page 6, of the public records of Indian River County, Florida, the By-Laws of Windsor Community Association, Inc. ("By-Laws") which is an exhibit to the Declaration, and the Articles of Incorporation of Windsor Community Association, Inc., filed with the Secretary of State of the State of Florida.

The Lot has a street address of             **3120 Savannah Place, Vero Beach, Florida 32963**

1.     **PURCHASE PRICE.**

(a)     **General.** The purchase price for the Lot ("Purchase Price") shall be **$ 505,000.00** and shall be payable by Purchaser to Seller as follows:

| | |
|---|---|
| (i)     Initial deposit held in escrow by O'Haire, Quinn & Candler, Chartered | **$    5,000.00** |
| (ii)     Ten (10%) percent of the Purchase Price shall be due **10 days after Effective Date**. | **$   45,500.00** |
| (iii)     Balance of the Purchase Price, not including closing costs which are the responsibility of Purchaser under Section 3 of Exhibit "A" to this Agreement, due at Closing | **$   454,500.00** |
| TOTAL PURCHASE PRICE: | **$   505,000.00** |

(b) **Earnest Money.**     The parties acknowledge and agree that the earnest money deposit ("Earnest Money") shall be placed in an interest-bearing escrow account and shall be applied to the purchase price at Closing. All interest earned on the Earnest Money, except in the event of Purchaser's default under this Agreement as provided in Section 9 shall be credited to Purchaser at Closing.

(c) **Form of Payment.** All amounts due hereunder shall be paid in United States Dollars by certified or cashier's check drawn on a local Vero Beach, Florida bank, or by electronic or wire transfer,

Cardinal Drive, Vero Beach, Florida 32963 on a date not later than ~~June 11, 2002~~ *July 11*. Closing costs shall be paid by Purchaser and Seller as set forth in the Disclosures and Acknowledgments attached hereto and incorporated herein as Exhibit "A".

4.    **TITLE.**

(a)  **Title.**  At Closing, Seller shall convey good, marketable and insurable title to the Lot to Purchaser by general warranty deed, subject only to (i) matters approved or waived by Purchaser as provided below; (ii) current and future real property taxes and assessments; (iii) general utility and right-of-way easements serving the Lot; (iv) the zoning and land use ordinances of Indian River County, Florida; (v) any recorded covenants, conditions or restrictions encumbering the Lot, including the Declaration and the Supplemental Declaration (if any); (vi) any matters which would be disclosed by an accurate survey and inspection of the Lot; (vii) rights of Indian River County and the State of Florida; and (viii) standard title exceptions for property bounded by the Atlantic Ocean or the Indian River (to the extent (vii) and (viii) apply to the Lot).

(b)  **Title Insurance.**  At least twenty (20) days prior to the date of Closing, Seller shall deliver to Purchaser an owner's title insurance commitment showing that Seller is vested with title to the Lot, issued by a title insurance company selected by Seller and licensed in the State of Florida, for an ALTA owner's title insurance policy for the Lot. The commitment shall provide for title insurance in the full amount of the Purchase Price and shall be subject only to the exceptions set forth in subsection 4(a) above which Purchaser by the execution of this Agreement specifically approves. The policy shall be delivered to Purchaser after Closing.

5.    **POSSESSION.**  Unless otherwise agreed to by both parties in writing, possession of the Lot shall be delivered to Purchaser at Closing.

6.    **SUBDIVISION IMPROVEMENTS.**

(a)  **Incomplete Development.**  Purchaser acknowledges and recognizes that inasmuch as Purchaser may be purchasing the Lot during the period of construction and the Lot may be completed prior to the completion of other lots and streets in the Windsor community, there may be certain inconveniences until construction is completed, and Purchaser waives all claims with respect thereto. Purchaser agrees that if Purchaser, Purchaser's family, guests, employees, contractors, agents, or invitees enters onto any area of construction, they do so at their own risk, and neither Seller, nor Seller's contractors, agents or employees shall be liable for any damage, loss or injury to such persons.

(b)  **Repairs to Subdivision Improvements.**  Purchaser agrees to use Purchaser's best efforts to avoid altering or causing damage to Seller's community and subdivision improvements, which include, but are not limited to paved streets and drainage, central water lines, central sewer lines, signage, landscaping, entry features and irrigation systems, during construction of Purchaser's residence and hereby assumes full responsibility for the cost of any maintenance and repair of community and subdivision improvements necessitated by Purchaser's activities or the activities of its contractors, subcontractors, or agents in the Windsor community.

(c)  **Water and Sewer Service.**  Purchaser shall, at Purchaser's expense, tap onto the central water and central sewer systems to obtain potable water and sewer services to the Lot and shall be responsible for any connection fees and monthly availability fees charged for potable water or sewer service. Impact fees for sewer and potable water charged by local governmental entities have been prepaid by the Seller and are included in the Purchase Price of the Lot. If non-potable water is provided by the Seller, Purchaser must connect to that system and there may be a tap-on fee to be paid by Purchaser as well as a monthly use fee.

8.      **PURCHASER'S OBLIGATION TO IMPROVE LOT.**

(a)  Purchaser covenants and agrees to cause construction of a single-family residential home to begin on the Lot WITHIN TWENTY-FOUR (24) MONTHS AFTER CLOSING, and to cause such construction to be completed and a certificate of occupancy issued WITHIN EIGHTEEN (18) MONTHS of the date on which construction is begun.  Once construction is commenced on the Lot Purchaser shall diligently pursue construction of the home to completion and obtain a certificate of occupancy for the home.  Purchaser agrees, and the deed of conveyance to Purchaser shall provide, that if construction on the Lot shall not have been commenced within the required time period or if a certificate of occupancy shall not have been issued for the home within the required time period (which time periods may be extended by Seller by written notice from Seller delivered to Purchaser), then at any time within ninety (90) days after the expiration of such required time periods (plus any extension, if applicable), Seller shall have the right, by delivering to Purchaser or the owner of the Lot written notice of its intent to repurchase prior to the expiration of such ninety (90) day period, to require the conveyance written notice of its intent to repurchase prior to the expiration of such ninety (90) day period, to require the conveyance of the Lot to Seller or any third designated by Seller by general warranty deed (subject to the same exceptions to title set forth in the deed of conveyance to Purchaser and subject to standard and customary easements that do not hinder the use of, development of and/or construction of improvements upon the Lot or any portion thereof)  for a total consideration equal to the Purchase Price paid by Purchaser hereunder, together with Purchaser's actual cost of any improvements placed on the property but not including architectural fees, other professional fees and closing costs.  If Purchaser is so notified, the Lot shall be conveyed to Seller within thirty (30) days after the date of receipt of Seller's notice and, upon conveyance, Seller shall pay the owner the repurchase price in funds immediately available in Indian River County, Florida.  Real property taxes and assessments shall be prorated as of the date of such reconveyance in the manner provided in this Agreement.  If the title proposed to be conveyed to Seller is subject to any lien, encumbrance or other defect which is not permitted in this Section, Seller, in addition to all other rights and remedies which it may have at law or in equity, may remove any such lien, encumbrance or defect and deduct all costs and expenses incurred by Seller (including, but not limited to, attorney's fees) from the amount of the purchase price otherwise payable as provided in this Section.  The failure of Seller to give notice of its election to repurchase within the ninety (90) day time period provided above shall automatically terminate such right of repurchase.  Seller agrees that Purchaser shall be entitled to reasonable extensions of the time periods set forth above in the event of delays caused by Acts of God, material shortages, labor strikes, or similar conditions including delays caused by municipal government, beyond the control of Purchaser.

(b)  Upon the issuance of a certificate of occupancy for a home located on the Lot within the time period set forth above, the right to repurchase herein provided for shall terminate and Seller shall, upon receipt of written request from owner of the Lot, execute a release of such right to repurchase in recordable form.

(c)  For purposes of this Section, construction shall be deemed to have commenced only upon approval of plans for a single family residential home by the Architectural Review Committee of the Association, issuance of a building permit by Indian River County, Florida, and completion of the foundation of the residential dwelling on the Lot.  The deed of conveyance to Purchaser shall provide that this right to repurchase is subordinate to any first priority mortgage or deed to secure debt securing a bona fide construction loan on the Lot.

9.      **DEFAULT AND REMEDIES.**  In the event of Purchaser's default in the performance of any obligation or covenant under this Agreement prior to Closing or which prevents Closing from taking place as provided herein, Seller may elect to terminate this Agreement by written notice to Purchaser sent by certified mail, return receipt requested.  Purchaser shall have 30 days following receipt of such notice to cure the default claimed by Seller.  In the event Purchasers fail to cure the default claimed, seller may

10.    **GOVERNING LAW.** This Agreement, and all of the relationships between the parties hereto, shall be construed and interpreted in accordance with the laws of the State of Florida.

11.    **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the parties' successors and assigns. Purchaser shall not assign this Agreement or any interest hereunder, in whole or in part, without the prior written consent of Seller, which consent may be withheld for any reason or for no reason. Any attempted assignment by Purchaser without Seller's prior approval shall be null and void. Seller may assign its rights and obligations hereunder without the approval or consent of Purchaser.

12.    **NOTICE.** Each notice or document (collectively referred to in this Section as "notice") required or permitted to be given hereunder must comply with the requirements of this Section. Each such notice shall be in writing and shall be delivered either by personally delivering it, delivering it by courier service, or by depositing it with the United States Postal Service or any official successor thereto, certified mail, return receipt requested, with adequate postage prepaid, addressed to the appropriate party (and marked to a particular individual's attention). The addresses of the parties to which notice is to be sent shall be those set forth on page one (1) of this Agreement. Either party may change such address by written notice to the other party designating the new address in accordance with this Section.

13.    **SEVERABILITY.** The provisions of this Agreement are intended to be independent, and in the event any provision hereof should be declared by a court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason whatsoever, such illegality, unenforceability, or invalidity shall not affect the remainder of this Agreement.

14.    **ENTIRE AGREEMENT.** This Agreement and the exhibits hereto contain the entire agreement between the parties hereto. No agent, representative, salesman, or officer of the parties hereto has any authority to make, or has made, any statements, agreements, or representations, either oral or in writing, express or implied, modifying, adding to, or changing the terms and conditions hereof, and neither party has relied upon any representations not set forth in this Agreement. No dealings between the parties or custom shall be permitted to contradict, add to, or modify the terms hereof. No waiver or amendment to the provisions hereof shall be effective unless in writing and signed by both parties.

15.    **NON-RECORDATION OF AGREEMENT.** The parties agree that neither this Agreement nor a copy of this Agreement shall ever be filed of record. If either party does so record, the other party may avail itself of any remedies available to it at law or in equity. There may be recorded, however, at Seller's option, a memorandum of agreement or similar document referencing this Agreement in the official records of Indian River County, Florida, providing record notice of the existence of this Agreement under Florida law.

16.    **SURVIVAL.** All provisions of this Agreement shall survive the Closing of the purchase and sale contemplated by this Agreement and shall not be merged into the deed of conveyance.

17.    **NO WAIVER.** Failure of either party to insist upon compliance with any provision hereof shall not constitute a waiver of the rights of such party to subsequently insist upon compliance with that provision or any other provision of this Agreement.

18.    **CAPTIONS AND GENDER.** The captions used herein are for convenience only and shall not be considered in the construction of the various provisions of this Agreement. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter genders, as appropriate.

19.    **COUNTERPARTS.** This Agreement may be executed in separate counterparts. It shall

22. **BROKER'S FEE:** Each party warrants, acknowledges and agrees that no broker(s) or salesperson(s) other than Windsor Real Estate, Inc. and __N/A__ have ever been involved in this transaction as the Broker(s) of record for this transaction and agrees to pay Windsor Real Estate, Inc. [COMPLETE ONLY ONE] __N/A__ % of gross purchase price; **OR $** __N/A__ , and agrees to pay the above co-broker __N/A__ % of gross purchase price; **OR $ N/A** , as a brokerage commission.  Said brokerage commission shall be paid at time of closing this transaction.  If Buyer fails to perform and deposit(s) is retained, 50% thereof, but not exceeding the Broker's fee above provided, shall be paid Broker as full consideration for Broker's services, including costs expended by Broker, and the balance shall be paid to Seller.  If the transaction shall not close because of refusal or failure of Seller to perform, Seller shall pay the full fee to Broker on demand.  In any litigation arising out of the Contract concerning the Broker's fee, the prevailing party shall recover reasonable attorney's fees and costs.   Each party further agrees to indemnify and hold the other party harmless from and against any and all claims made by any other broker(s) or salesperson(s) seeking any commission or compensation for any loss, liability, costs or expense arising by, through or under said indemnifying party.   Such indemnification shall include reimbursement of any attorney's fees and costs, including those accruing from alternative dissolute resolution proceedings, trial and appellate proceedings, incurred as a result of such claims made or such lawsuits filed.  Seller is responsible for payment of compensation of the broker(s) named herein unless otherwise provided.

See Exhibits A, B, C, and D attached hereto and made a part hereof.

**PURCHASER:**

Robert J. Darretta, Jr.

Date Signed: 4/7/02

Mary Ellen Darretta

**SELLER:**

WINDSOR PROPERTIES, a Florida general partnership, By: Torwest, Inc., General Partner

By: _____

John A. Brough

Title: President

Date Signed: 4/8/02

**COOPERATING BROKER, IF ANY:**

Company Name: _____

Selling Agent: _____

Address: _____

Telephone: _____

Purchaser's Initials

EXHIBIT "A"

### Disclosures and Acknowledgments

1.  **RESPA DISCLOSURE.** As required by the Real Estate Settlement Procedures Act of 1974, Purchaser acknowledges that Seller has not directly or indirectly required Purchaser, as a condition of sale, to purchase either a fee owner's or mortgagee's title insurance policy from any particular title company. Seller has advised Purchaser that it will purchase, at Seller's sole cost and expense, a fee owner's title insurance policy from the title company of its choosing. Seller also has advised Purchaser that if Purchaser does not wish Seller to purchase the title insurance policy from such company, Purchaser may elect to obtain such insurance from a company of Purchaser's choice and Purchaser shall pay, at Closing, the title insurance premium for such policy. In any event Seller shall provide the title commitment to Purchaser as provided in Section 4 of the Agreement.

2.  **COSTS AND PRORATIONS.** Except as otherwise specifically provided herein, Purchaser shall be responsible for all closing costs incurred by Purchaser and Seller shall be responsible for all closing costs incurred by Seller, including their respective attorneys' fees.

    (a) **Seller's Closing Costs.** At Closing, Seller shall pay the following:

        (i)    all costs incident to the release of the Lot from existing mortgages and financing statements, if any;

        (ii)    the cost of all documentary stamps which are required to be affixed to the deed of conveyance;

        (iii)    the cost of an owner's policy of title insurance on the Lot.

    (b)    **Purchaser's Closing Costs.** At Closing, Purchaser shall pay the following:

        (i)    all recording fees, including the fee for recording the deed of conveyance; and

        (ii)    all charges incident to any mortgage executed by Purchaser.

    (c) **Taxes and Assessments.** Taxes for the current year shall be prorated based on the current year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If closing occurs at a date when the current year's millage is not fixed, and current year's assessment is available, taxes will be prorated based upon such assessment and the prior year's millage. If current year's assessment is not available, then taxes will be prorated on the prior year's taxes. Either party has the right to have the taxes re-prorated after closing when actual tax bill for the year of closing is issued with due allowance made for maximum allowable discount.

    (d) **Common Expense Assessments.** The annual assessments, if any, levied by the Association against the Lot as provided in the Declaration shall be prorated as of the first day of the month following Closing. All installments of the assessment due and payable after the date of Closing shall be paid by Purchaser to the Association at such times and in such manner as provided by the Board of Directors of the Association. All other amounts assessed against the Lot by the Association shall be paid in accordance with the terms and provisions of the Declaration.

(e) Contribution to Working Capital. At Closing, Purchaser shall pay a one time contribution

ten (10) years of ownership by the Association, which estimate is attached hereto and incorporated herein as Exhibit "B".

(b) As of the date of Closing water and sewer lines shall be extended to the Lot and electric service shall be made available to the Lot, or Indian River County, Florida shall be obligated to install these utilities within one hundred eighty (180) days of the date of Closing. Sewer service and potable water service will be provided by Indian River County, Florida. If non-potable water is provided by Seller, Purchaser must connect to that system and there may be a tap-on fee to be paid by Purchaser.

**4. PERSONAL INSPECTION OF LOT.** Purchaser acknowledges that the Purchaser or his or her spouse has made a personal, on-the-lot inspection of the Lot prior to the execution of this Agreement.

**5. PLAN APPROVAL.**

(a) **Procedure.** Purchaser acknowledges that the Declaration requires the approval of plans and additional information by the Windsor Architectural Review Committee ("WARC") of the Windsor Community Association, Inc. prior to the commencement of construction activities on the Lot and that the WARC may charge a reasonable fee for such review. Prior to Purchaser commencing any plans for a dwelling on the Lot, Purchaser, Purchaser's architect and/or contractor shall meet with the WARC to review the Windsor Code (as that term is defined in the Declaration) promulgated by the WARC. Prior to the Purchaser's applying for a building permit for the Lot, Purchaser shall submit to the WARC for approval the preliminary site plan, preliminary elevations, preliminary floor plans, and any other plans required by the Windsor Code promulgated by the WARC, for the construction to be done on the Lot ("Plans"). The WARC shall deliver notice to Purchaser of its approval or disapproval following receipt of the Plans. In the event of disapproval, Purchaser shall revise and resubmit the Plans to the WARC and the same procedure provided above shall be followed and repeated until the Plans are approved in writing by the WARC.

(b) **Modification to Plans.** Purchaser shall submit to the WARC, and the WARC shall have the right to approve or disapprove, any and all modifications to the Plans. The WARC shall deliver notice to Purchaser of its approval or disapproval promptly after receipt of notice of the modification. Upon disapproval, the foregoing procedure shall be repeated until written approval is obtained.

(c) **Construction.** Purchaser shall cause all construction and development on the Lot to be performed substantially in accordance with the approved Plans. All construction on the Lot shall be performed only by builders and contractors licensed by the appropriate governmental entity and approved by the WARC according to the guidelines and criteria for builders and contractors promulgated by the WARC.

(d) **Encroachments.** If any encroachment of the chimney or ground level steps of the home built on the Lot is constructed into rights-of-way within the Windsor community which is permitted by the WARC and Indian River County, Florida, then damage caused by such work within the utility easement areas shall be the responsibility of the Purchaser and Purchaser agrees to indemnify and hold harmless Seller and Indian River County, Florida from damage to such encroachments.

**6. CLUB.**

(a) **Disclaimer.** A privately owned golf course, beach club, and related facilities, The Windsor Club, Inc. ("Club") will be located adjacent to and within the boundaries of the Windsor community. No representations or warranties have been or are made by the Seller or any other person with regard to the continuing ownership of or use rights in the Club. Purchaser acknowledges and understands that he/she does not acquire any interest in the Club by virtue of taking title to the Lot. Purchaser acknowledges that neither Seller, Seller's agents, nor any other person has made any representation, either express or

7. **RADON DISCLOSURE.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Seller has not investigated to determine whether radon gas or other environmental pollutants are present on the Lot or in the Windsor community. Purchaser acknowledges that such conditions may exist and that Seller has not analyzed or verified the extent of any such environmental or health hazards that may affect the Lot.

**8. DISCLOSURE SUMMARY:**

A.     AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNER'S ASSOCIATION, AND YOU SHALL NOT EXECUTE THE CONTRACT UNTIL AFTER YOU HAVE READ THE FOLLOWING DISCLOSURE SUMMARY.

B.     THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

C.     YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION, WHICH ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

D.     YOUR FAILURE TO PAY THESE ASSESSMENTS COULD RESULT IN A LIEN ON YOUR PROPERTY.

E.     THERE IS NOT AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION.

F.     IN SOME CIRCUMSTANCES, THE RESTRICTIVE COVENANTS CAN BE AMENDED WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERS.

G.     THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE AND, AS A PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS.

H.     THESE DOCUMENTS ARE MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED.

Buyer hereby acknowledges receipt of the above Disclosure Summary as required by Florida Statute §689.26 (1998) prior to executing this Contract.

_____
Buyer(s)' Initials

PURCHASER ACKNOWLEDGES HE HAS RECEIVED AND REVIEWED THE DISCLOSURE INFORMATION SET OUT IN THIS EXHIBIT "A" TO THE LOT PURCHASE AGREEMENT.

_____
Robert J. Darretta, Jr.

EXHIBIT "B"

**Estimate of Cost of
Maintaining Roads at Windsor**

The Windsor Community Association has accepted and is obligated to maintain the roads at Windsor. The cost of road maintenance will be paid by the Windsor Community Association, Inc. from the proceeds of assessments levied against each Lot as provided for in the Declaration of Covenants, Conditions and Restrictions for Windsor. The following is a good faith estimate of the cost of road maintenance over a 10 year period.

| Year | Length of Road (in Feet) | Estimated Cost Per Linear Ft. | Total Estimated Annual Cost |
|------|--------------------------|-------------------------------|-----------------------------|
| 1993 | 20,000 | $0.95 | $19,000 |
| 1994 | 25,000 | $0.95 | $23,750 |
| 1995 | 30,000 | $0.95 | $28,500 |
| 1996 | 35,000 | $0.95 | $33,250 |
| 1997 | 40,000 | $0.95 | $38,000 |
| 1998 | 40,000 | $0.95 | $38,000 |
| 1999 | 40,000 | $0.95 | $38,000 |
| 2000 | 40,000 | $0.95 | $38,000 |
| 2001 | 40,000 | $0.95 | $38,000 |
| 2002 | 40,000 | $0.95 | $38,000 |
| 2003 | 40,000 | $0.95 | $38,000 |

## EXHIBIT "C"

### Parcel Legal Description

Parcel _____, Block _____, WINDSOR PHASE/PLAT __1__ PD, being more particularly described as follows:

Lot _2_, Block _15_, WINDSOR PHASE/PLAT __1__ PD, recorded in Plat Book ___13___, Page _51___, of the Public Records of Indian River County, Florida,

EXHIBIT "D"

COASTAL CONSTRUCTION CONTROL LINE RIDER

SELLER:   WINDSOR PROPERTIES, a Florida general partnership

PURCHASER:                    Robert J. Darretta, Jr. and Mary Ellen Darretta

PROPERTY ADDRESS:        3120 Savannah Place, Vero Beach, FL 32963

This addendum is specified in the Contract for Sale and Purchase dated November 7, 2000 between the parties that have signed below and is incorporated therein by reference.

___ Yes  XX No   COASTAL ZONING PROTECTION ACT OF 1985
The real property which is the subject of this Contract is located either partially or totally seaward of the Coastal Construction Control Line (CCCL), as defined in Florida Statute 161.053, and is therefore subject to governmental regulation. Florida law requires Seller to provide Purchaser with an affidavit or a survey meeting the requirements of Chapter 472 of the Florida Statutes, delineating the location of the CCCL on the Real Property at or prior to the closing, unless Purchaser waives this requirement in writing.

Purchaser accepts the attached copy of an aerial photograph of the property, done by the State of Florida, delineating the Control Line as Seller's compliance with the Coastal Zoning Protection Act, and Purchaser waives the right to an affidavit or survey.

XX  Yes ___ No   COASTAL BUILDING ZONE
Seller represents that the subject property lies within the Coastal Building Zone.

PURCHASER:                              SELLER:
                                        WINDSOR PROPERTIES, a Florida general
                                        partnership
Robert J. Darretta, Jr.                 By: TorWest, Inc., General Partner
                                        By: _____
Mary Ellen Darretta                         John A. Brough, President
DATE:  4-7-02

                                        DATE: _____4\8\02_____

# ADDENDUM TO LOT PURCHASE AGREEMENT

This Addendum to that certain Windsor Lot Purchase Agreement by and between
**WINDSOR PROPERTIES** , a Florida general partnership, the Seller and
**Robert J. Darretta, Jr. and Mary Ellen Darretta (FREC Reg)**, the Purchaser.

Seller and Purchaser agree that the following special stipulations shall be made a part of
the Windsor Contract for Sale and Purchase between them:

Seller agrees to pay Buyer, a Florida Licensed Real Estate Broker, in the amount of
$25,250 which shall be reflected as a credit to Buyer on the settlement statement at time
of closing.

BUYER

Robert J. Darretta, Jr.

Mary Ellen Darretta

Date: _4-7-02_

SELLER

WINDSOR PROPERTIES, a Florida general
partnership
By: Torwest, Inc., General Partner

By: _____
John A. Brough, President
Date: _4\8\02_

# EXHIBIT 2

# THE WINDSOR CODE

## PURPOSE OF THE WINDSOR CODE
### SECTION ONE

## ARCHITECTURAL STANDARDS
### SECTION TWO

**WINDSOR**

# THE WINDSOR CODE

*The Windsor Code* is designed to ensure simplicity
and coherence in the buildings at Windsor.
Its guidelines prescribe an unadorned architecture unique
to Windsor and its climate.



The distinctive features of the architecture at Windsor are its
steeply pitched metal or wood roofs, open eaves with exposed rafter tails,
vertically proportioned windows and doors, cantilevered balconies,
small window panes, and exterior walls in warm, neutral colors.
The careful articulation of these simple structural elements and details
and the adept arrangement of simple building geometries
create Windsor's architectural aesthetic.

The purpose of *The Windsor Code* is to secure the common use of
this architectural style as the means for uniting all of the buildings
at Windsor into a visually coherent composition.

*The Windsor Code*, which includes a REGULATING PLAN, ARCHITECTURAL STANDARDS, BUILDING PLACEMENT STANDARDS, LANDSCAPING STANDARDS, and an ARCHITECTURAL REVIEW PROCEDURE, has been prepared for use in the Windsor community. This manual may not be photocopied, in whole or in part, without the expressed written permission of Windsor Properties, a Florida General Partnership, and may not be used for any other purposes whatsoever. All copyrights and publishing rights are exclusively reserved by the developer, except for the BUILDING PLACEMENT STANDARDS, which are jointly reserved by R. Geoffrey Ferrell & Associates and Duany Plater-Zyberk & Company, Architects and Town Planners.

Under the terms of the *Declaration of Covenants, Conditions, and Restrictions for Windsor*, *The Windsor Code* is binding on all parties having an interest in any portion of the community and each OWNER is required to comply with the requirements set forth herein. The developer and the Board of Directors of the community may, from time to time, update and revise *The Windsor Code*. This version of the *Code* was prepared and edited by Richard Shearer, and includes renderings by Charles Barrett, Dana Little, and James Dougherty.

©1997 Windsor Properties, Inc. All rights reserved.

# THE WINDSOR CODE

## CONTENTS

### PURPOSE OF THE WINDSOR CODE
#### SECTION ONE

Purpose and Summary of *The Windsor Code* ........................................................................... 1.1
Understanding the Regulating Plan ....................................................................................... 1.3
Glossary ............................................................................................................................... 1.4

### ARCHITECTURAL STANDARDS
#### SECTION TWO

General Specifications ........................................................................................................... 2.1
Privacy ................................................................................................................................. 2.2
Exterior Building Walls ........................................................................................................ 2.3
Windows and Doors ............................................................................................................. 2.4
Garden Walls and Fences ..................................................................................................... 2.6
Balconies, Porches, and Loggias ........................................................................................... 2.7
Roofs and Gutters ................................................................................................................ 2.8
Ancillary Structures ............................................................................................................. 2.9
Exterior Lighting ................................................................................................................. 2.10
Mechanical Equipment and Exterior Hardware .................................................................. 2.11
Building and Garden Wall Colors ........................................................................................ 2.12

### BUILDING PLACEMENT STANDARDS
#### SECTION THREE — (SEPARATE BOOKLETS)

Windsor House Sites (TYPE W)
Sideyard House Sites (TYPE S)
Row House Sites (TYPE R)
Tennis Cottages Sites (TYPE TC)
Village Fairway House Sites (TYPE VF)
Windsor Garden House Sites (TYPE WG)
Fairway Garden House Sites (TYPE FG)
Country Estate Sites (TYPE C)
Ocean Estate Sites (TYPE OE)
Lake Cottage Sites (TYPE LC)
Beach Cottage Sites (TYPE BC)

### ARCHITECTURAL REVIEW PROCEDURE
#### SECTION FOUR — (SEPARATE BOOKLET)

Architectural Review Procedure ........................................................................................... 4.2
Review Procedure for Each Design Phase ............................................................................ 4.5

Review Application Forms

*Form A(1): Pre-Design Code Review: Agreement to Work Within The Windsor Code*
*Form A(2): Agreement to Work Within The Windsor Code*
*Form B: Sketch Review: Application for Building Placement Design Review*
*Form C: Major Review: Application for Schematic Design Review*
*Form D: Final Review: Application for Construction Drawings Review*
*Form E: Application for Landscape Design Review*
*Form F: Application to Start Construction*
*Form G: Request for Final Inspection*

Windsor Architectural Review Committee ........................................................................................ 4.7

## LANDSCAPING STANDARDS
### APPENDIX A — (SEPARATE BOOKLET)

Landscaping Standards ..................................................................................................................... A.1
Windsor Recommended Plant List ................................................................................................... A.4

# PURPOSE OF THE WINDSOR CODE
## SECTION ONE

## PURPOSE AND SUMMARY OF THE WINDSOR CODE

Windsor is being built with several objectives in mind. The first is to create a carefully planned community consisting of a CENTRAL VILLAGE* and a SOUTH VILLAGE, each with memorable STREETS and squares, complemented by detached houses along the Atlantic Ocean and on the perimeter of the Windsor Golf Course. The second is to provide a variety of building configurations, allowing lot OWNERS to create architecturally significant houses with unique interior spaces and private gardens. The third is to make sure that the architecture of each house contributes to making Windsor a coherent, unified whole.

To achieve these goals, Windsor's town planners created *The Windsor Code*, which consists of four parts: the REGULATING PLAN, the ARCHITECTURAL STANDARDS, the BUILDING PLACEMENT STANDARDS, and the ARCHITECTURAL REVIEW PROCEDURE; and a supplement: the LANDSCAPING STANDARDS.

The purpose of *The Windsor Code* is not to produce stylistic conformity, but visual harmony among buildings through the common use of similar architectural proportions, elements, and materials. Creativity is not curtailed; rather, originality and diversity are supported by the *Code*'s specific standards and clear plan. The prescribed guidelines and conventions offer an architectural vocabulary whose grammatical rules, nonetheless, afford endless variety and richness of architectural expression.

### THE WINDSOR ARCHITECTURAL STYLE

To secure compatibility and coherence among the buildings at Windsor, *The Windsor Code*'s coordinated standards prescribe an unadorned, unpretentious architecture unique to the area and its climate. Simple construction details and structural elements, not applied ornament, create the architectural aesthetic. The plain geometries, regular proportions, and expressed structure of this style underlie the beauty and integrity of the houses at Windsor. Refined simplicity and restrained dignity are the hallmarks of this architectural style, whose common use unites all of Windsor's buildings into a visually compelling composition.

The distinctive features of the Windsor architectural style are the following:

1. Steeply pitched wood or metal roofs
2. OPEN EAVES that are deep and have exposed rafter tails
3. Vertical proportions for windows, doors, and the spaces between posts or piers
4. BALCONIES cantilevered over the STREET
5. Windows with small panes of glass
6. Exterior building walls in warm, neutral colors

The Windsor architectural aesthetic was developed through careful study of traditional and vernacular architecture in neighboring areas. From the architecture of the Caribbean, the Louisiana Tidewater, and the American Southeast, elements appropriate to the climate of Florida's central east coast were adapted as its defining features. Often described as Anglo-Caribbean, the resulting architecture is not an imitation of any singular style or a pastiche of disparate styles. The style prescribed by *The Windsor Code* is unique to the area—an authentic regional architecture.

---

\* Words in SMALL CAPITALS have specific meanings in *The Windsor Code*. See Glossary, pp. 1.5–1.7.

## THE WINDSOR REGULATING PLAN

Each house at Windsor, whether in the VILLAGES, on the edge of the golf course, or along the ocean, participates in the unifying aesthetic and architectural composition of the community. The principal part of *The Windsor Code* for governing and guaranteeing this overall goal is the REGULATING PLAN. It assigns the appropriate BUILDING PLACEMENT STANDARDS and other design parameters to each site.

By carefully controlling the arrangement of sites for houses and CIVIC BUILDINGS, the location of squares and greens, and the layout of an integrated system of STREETS and COMMON DRIVES, the REGULATING PLAN provides a coherent context for sound design and development.

Before the process of designing a house begins, the lot OWNER and the architect should study the REGULATING PLAN and discuss with the TOWN-PLANNER how the site and house fit into and best contribute to the overall design of Windsor.

## THE WINDSOR ARCHITECTURAL STANDARDS

To define clearly Windsor's unique architectural style, and to safeguard its proper implementation, Windsor created the ARCHITECTURAL STANDARDS. These standards address the architectural character of the community by regulating the configurations of all architectural elements—those formal or structural components of a building that give it architectural expression. Each element is prescribed in terms of allowable materials, configurations, construction methods, and manner of use.

As the defining features of Windsor's architectural style, the ARCHITECTURAL STANDARDS support creative architectural expression and secure simplicity and integrity in the design of individual houses. The common use of these conventions allows diversity in design at the same time it advances the intelligibility and coherence among Windsor's entire community of buildings.

## THE WINDSOR BUILDING PLACEMENT STANDARDS

To preserve the privacy of each residence and to create well-defined STREETS, squares, and greens, Windsor developed BUILDING PLACEMENT STANDARDS for all sites in the VILLAGES, bordering the fairways, and on the oceanfront.

The VILLAGE Houses at Windsor are designed for towns. Unlike conventional developments, where suburban houses are indiscriminately sited or simply pushed together, these houses are intended to be close to one another and close to the STREET. The BUILDING PLACEMENTS STANDARDS for VILLAGE Sites and Ocean Sites (excluding Ocean Estates) require houses to line the STREET and to have walled gardens. For privacy, the standards for these houses mandate that the views from their windows be directed toward the STREET or into their own courtyards, not into neighboring houses and yards.

The BUILDING PLACEMENT STANDARDS for Fairway Sites and Ocean Estate Sites specify houses surrounded by yards. Common to both types of sites is the requirement that their freestanding houses be built at a specific distance from the fairways or the beach. So aligned, each house is guaranteed to have an unobstructed, 180-degree view of the Windsor Golf Course or the Atlantic Ocean.

## THE WINDSOR ARCHITECTURAL REVIEW COMMITTEE AND
## THE WINDSOR ARCHITECTURAL REVIEW PROCEDURE

Windsor formed the Windsor Architectural Review Committee (WARC or the REVIEW COMMITTEE) and created the ARCHITECTURAL REVIEW PROCEDURE to protect the property values of all lots, both now and in the future. The responsibility of the REVIEW COMMITTEE is to review all house and landscape plans for compliance with *The Windsor Code* and MASTER PLAN and to provide design guidance when necessary. This committee is the sole judge of whether the requirements of the *Code* have been properly fulfilled.

To make sure that each house complies with *The Windsor Code*, the ARCHITECTURAL REVIEW PROCEDURE requires the OWNER's architect to meet with the TOWN-PLANNER at a Pre-Design Code Review before beginning to design. The architect must then submit the house design to WARC at three successive phases of review: Sketch Review (Building Placement Design), Major Review (Schematic Design), and Final Review (Construction Drawings). WARC may inspect the house during construction and, upon completion, will perform a final inspection for conformity with the *Code*.

## THE WINDSOR LANDSCAPING STANDARDS

To foster a landscape aesthetic in keeping with Windsor's natural surroundings and complementary to its architecture, Windsor created the LANDSCAPING STANDARDS as a supplement to the ARCHITECTURAL STANDARDS. At Windsor, the landscaping of STREETS is intended to be simple yet refined, with trees lining the STREETS, vines climbing up building walls, and lush plants spilling over the GARDEN WALLS of private residences. For individual lots, only the types of trees, vines, and plants visible from the STREET are regulated by the LANDSCAPING STANDARDS and subject to review by WARC. To assist OWNERS in the selection of plant species indigenous or appropriate to Windsor's unique climate, which is both tropical and temperate, Windsor compiled the Windsor Recommended Plant List as part of these standards.

# UNDERSTANDING THE REGULATING PLAN

As the principal tool for implementing the Windsor MASTER PLAN, the REGULATING PLAN identifies the basic physical characteristics of each site and the type of house reserved for it. Examples of the information provided on the REGULATING PLAN are illustrated below.

**A single line indicates the following:**
1. The house must be built to this corner.
2. The greatest mass of the house must be along the side where the line is longest.
3. The house can be one or two stories.
4. For a one-story house, at least 20 percent of its footprint must be at least 20 feet to the eaves. That part of the house must be built at this corner.
5. A BALCONY or LOGGIA is not required on a one-story house.

**Lot number**

**Lot size**

**Block number**

**Site type (Windsor House)**
(BUILDING PLACEMENT STANDARDS)

**Hatching on two property lines indicates the following:**
1. At least 20 percent of the house footprint must be two stories and must be built to this corner.
2. The greatest mass of the house must be located along the side where the hatched area is longest.

**Utility court**
Walled on all sides

**COMMON DRIVE**
Provides access to garages



**Mandatory clear-zone for emergency-vehicle access**

**A dashed line indicates the following:**
1. The line to which the house is built, and where its roof is allowed to overhang the adjacent property.
2. The adjacent lot OWNER will be granted an easement for the use, landscaping, and maintenance of this area.

# GLOSSARY

In *The Windsor Code*, certain terms have meanings that often differ from common usage and from usage in conventional zoning and building codes. Identified by SMALL CAPITALS in the *Code*, these terms are defined below.

**ARCHITECTURAL REVIEW PROCEDURE:**
The ARCHITECTURAL REVIEW PROCEDURE is the part of *The Windsor Code* that ensures compliance with the *Code*. It comprises a required sequence of five phases of house design development and construction, which are reviewed and enforced by WARC. See Section Four.

**ARCHITECTURAL STANDARDS:**
The ARCHITECTURAL STANDARDS form the part of *The Windsor Code* that addresses building materials, configurations, and construction techniques for houses in the community. See Section Two.

**BALCONY:**
A second-story platform projecting from the wall of a building, cantilevered or supported by brackets, completely covered by a roof, and enclosed by a railing whose posts extend up to the eaves.

**BEACH ACCESS EASEMENT:**
A 15-foot-wide easement between Beach Cottage Sites that provides pedestrian access to the beach from Beach Cottages and Windsor Houses east of Eton Way.

**BEACH COURT:**
A short STREET, enclosed on three sides, whose 60-foot RIGHT-OF-WAY provides access to Beach Cottage and Windsor House Sites from Eton Way.

**BUILDING PLACEMENT STANDARDS:**
The BUILDING PLACEMENT STANDARDS form the part of *The Windsor Code* that regulates building form, e.g., footprint, height, setbacks, walls, and STREET-side BALCONIES, PORCHES, and LOGGIAS. See Section Three.

**CARRIAGE HOUSE:**
A detached or semidetached garage with an occupiable second story.

**CIVIC OR COMMUNITY BUILDINGS:**
Reserved for honorific locations that are focal points in the MASTER PLAN, these buildings and monuments (owned by the Windsor Community Association) are landmarks or visual reference points within Windsor's composition of STREETS, squares, and greens.

**COASTAL CONSTRUCTION CONTROL LINE (CCCL):**
The construction setback line established by the State of Florida, Department of Environmental Protection (DEP). At Windsor, houses and other structures cannot be constructed seaward of this line. However, dune crossovers (matching the dune crossovers at the Beach Club and without roofed structures) seaward of the CCCL are possible with permits from the DEP. Any grading or landscaping east of the CCCL also requires a permit from the DEP, but is discouraged by Windsor. Consult WARC.

**COMMON DRIVE:**
A 24-foot-wide, mid-block passageway that provides vehicular and golf-cart access to garages and general access to utility boxes. Within 25 feet of connecting STREETS, its RIGHT-OF-WAY narrows to 14 feet.

**GARDEN EASEMENT:**
The area of a lot between a common lot line and a line beyond which the house may not be built, but may overhang with its roof. The adjacent lot OWNER will be granted an easement for the use, landscaping, and maintenance of this area, as provided by the *Declaration of Covenants, Conditions, and Restrictions for Windsor*, Article XIII, Section 5, *Easements for Lots Within Blocks*. Consult Windsor.

**GARDEN WALL:**
A required masonry wall aligned or contiguous with private lot lines, COMMON DRIVES, the edge of the golf course, or the perimeter boundaries of the VILLAGES. Within the VILLAGES, GARDEN WALLS are required on all lot lines not built-to by a building wall.

**LANDSCAPING STANDARDS:**
The LANDSCAPING STANDARDS, which are a supplement to the ARCHITECTURAL STANDARDS, regulate all landscaping visible from the STREET. The Windsor Recommended Plant List is included in these standards.

**LOGGIA:**
A covered, second-story open space within the building envelope.

**MASTER PLAN:**
The overall design of Windsor, including *The Windsor Code*.

**MULLION:**
A vertical framing element (minimum 5 inches wide) that separates and supports windows, doors, or panels set in series.

**MUNTIN:**
A secondary framing element to hold panes within a window or glazed door.

**OPEN EAVES:**
Eaves with exposed roof rafter tails or soffited eaves with outriggers (the projection—actual or applied—of attic floor joists).

**OWNER:**
Any person or entity that holds the record title to a lot at Windsor and, thereby, a member of the Windsor Community Association, Inc.

**PORCH:**
A gallery for circulation that is attached to the main building, roofed, and open on at least two sides. Porches may be two stories high and may include two floors.

**REGULATING PLAN:**
The REGULATING PLAN works with the BUILDING PLACEMENT STANDARDS and the ARCHITECTURAL STANDARDS. It controls the layout of lots, STREETS, COMMON DRIVES, squares, greens, and CIVIC BUILDINGS, and identifies the placement of houses for all sites. See p. 1.4 and the printed REGULATING PLAN.

**REQUIRED BUILDING LINE:**
The line (generally the STREET RIGHT-OF-WAY) to which the building must be built to.

**RIGHT-OF-WAY:**
The STREET space, including pavement and VERGES, defined by the distance between lot frontages.

**STREET:**
All community open spaces, including STREETS, boulevards, avenues, ways, lanes, greens, squares, BEACH COURTS, places, the golf course, and dune crossovers, but not COMMON DRIVES.

**STREET AND SQUARE HIERARCHY (MAJOR STREET):**
The hierarchy of community spaces, listed in order of descending importance: Windsor Boulevard and Windsor Green, squares or greens, STREETS 72-feet wide, Charleston Drive, pinwheel squares, the polo field and golf course, BEACH COURTS, STREETS 48-feet wide, and ways or lanes, which are STREETS with 28-foot RIGHTS-OF-WAY. On lots adjacent to two or more STREETS, the house is usually required to be built-to or face the more hierarchically important STREET, which is the MAJOR STREET.

**TOWN-PLANNER:**
The urbanist responsible for implementing the MASTER PLAN and handling any contingencies that may arise. A WARC member, the TOWN-PLANNER also interprets *The Windsor Code* for OWNERS, architects, and landscape professionals.

**VERGE:**
The grassy area in the STREET RIGHT-OF-WAY between the pavement of the STREET and an adjacent lot line.

**VILLAGE (CENTRAL VILLAGE AND SOUTH VILLAGE):**
House sites and STREETS in the central area of Windsor, between Highway A1A and the Windsor Golf Course, and house sites and STREETS at the south end of Windsor, west of A1A and circumscribed by fairways. BUILDING PLACEMENT STANDARDS for sites in these areas require each house to contribute to the forming of STREET space—the community space—by being close to one another and close to the STREET.

**WARC OR THE REVIEW COMMITTEE:**
The Windsor Architectural Review Committee (WARC or the REVIEW COMMITTEE) is a group of individuals appointed by the developer. The purpose of the REVIEW COMMITTEE is to administer and enforce *The Windsor Code* for all new construction and building modifications in the Windsor community.



# ARCHITECTURAL STANDARDS

# ARCHITECTURAL STANDARDS
## THE WINDSOR CODE
### SECTION TWO



## GENERAL SPECIFICATIONS

1. All building plans shall be submitted to the Windsor Architectural Review Committee (WARC or the REVIEW COMMITTEE) for conformity to these standards. The ARCHITECTURAL REVIEW PROCEDURE includes a Pre-Design Code Review, Sketch Review (Building Placement), Major Review (Schematic Design), Final Review (Construction Drawings), and Final Inspection. See Section Four: ARCHITECTURAL REVIEW PROCEDURE.

2. The materials, configurations, and operations prescribed herein are standard; all others are prohibited.

3. Windsor Properties retains the right to adjust these standards as necessary.

# PRIVACY

## ARCHITECTURAL STANDARDS

To maintain a sense of civility and to preserve privacy, Windsor's MASTER PLAN carefully distinguishes between the realm of the community and the domain of the private house. This distinction is essential to creating a comfortable place to live—when either sphere is compromised, quality of life suffers.

Windsor's CENTRAL and SOUTH VILLAGES are low in density yet urban in character, with well-defined community spaces (STREETS, squares, and greens) and unique private spaces (house interiors and courtyards). The transitional element between these two realms is the STREET facade of the house. As such, it should be designed to both protect the privacy of interior rooms and allow these rooms to have views into the STREET. This can be achieved by installing shutters on STREET-side windows. On the ground floor, these shutters can be divided in two: a bottom half that can be closed for complete privacy from the STREET, and a top half that can be opened to admit natural light and allow for views into the STREET.

In contrast, the house's courtyard elevations may be more open, since privacy within the court is protected by high masonry walls and proper landscaping. Courtyard privacy is further protected by precluding intrusive window-views from nearby properties. The City of Charleston has a model method for regulating such window-views, which Windsor has adapted as its means of governing the relationship between neighboring houses.

In colonial Charleston, "Single-Houses" were houses "set sideways to the street" in an alternating series of buildings and yards. The broad, north side of each house faced the neighbor's garden, and out of common courtesy it became customary to limit windows on that side to those necessary for light. Universally practiced, "north-side manners" allowed each house to be open to its garden without compromising privacy.

Similarly, the propriety of north-side manners has been codified at Windsor. In the VILLAGES, the design of houses must respect the privacy of neighboring courtyards and their more open courtyard facades:

- Windows facing and within 28 feet of common property lines shall have either (a) sills a minimum of 6 feet above finished-floor level or (b) lower sills with a means of permanently obstructing views into neighboring windows and yards (e.g., fixed, louvered shutters adjusted only for air circulation and natural light). Only windows whose sight lines are confined to their lot by building walls or GARDEN WALLS are exempted from these restrictions.

- Second-story windows within 28 feet of COMMON DRIVES shall have either (a) sills a minimum of 6 feet above finished-floor level or (b) lower sills with a means of permanently obstructing views into neighboring windows and yards (e.g., fixed, louvered shutters adjusted only for air circulation and natural light). For windows facing COMMON DRIVES, Windsor recommends fixed Bahama shutters, which allow for views into the COMMON DRIVE but not into neighboring properties.

- No ground-floor windows shall be allowed to face and be within 5 feet of common property lines and GARDEN EASEMENTS. In such locations, second-story windows shall have sills a minimum of 6 feet above finished-floor level and may be required to have translucent glazing; fixed, louvered shutters; or some other means of permanently blocking views into neighboring properties. Only windows whose sight lines are confined to their lot by building walls or GARDEN WALLS are exempted from these restrictions.

Within the VILLAGES, no window, BALCONY, PORCH, LOGGIA, and dormer will be allowed to jeopardize the privacy of neighboring houses and courtyards and shall be reviewed accordingly.

# EXTERIOR BUILDING WALLS

## ARCHITECTURAL STANDARDS

Exterior building walls should appear solid, be made out of traditional building materials, and be configured to the constraints of load-bearing construction. The surface of the stucco should be neither crude and rough nor mirror-smooth, but slightly irregular in showing the hand of the workman.

## MATERIALS

*Where visible from the STREET, only the following are permitted:*

- Stucco
- Wood clapboard, 3½ to 6 inches to the weather
- Hardiplank® smooth siding, 3½ to 6 inches to the weather
- German drop-siding, no more than 8 inches to the weather
- Keystone (a Florida aquatic sedimentary stone)

## CONFIGURATIONS

*Where visible from the STREET, only the following are permitted:*

- A wooden second story above a stucco first story
- All-stucco structures
- All-wood structures
- Square or vertically proportioned openings, no more vertical than a quadruple square
- One segmental arch per house (including the CARRIAGE HOUSE but not its garage doors), no less than 12 inches in depth and with no surround (no architrave). Semicircular, elliptical, and pointed arches are prohibited.
- One circular or octagonal opening (glazed or unglazed) per house (including the CARRIAGE HOUSE)
- Arches and lintels configured as true load-bearing elements (no soldier courses supported on metal angles)
- Visible lintels that bear beyond the opening a dimension equal to their heights
- Stone or ersatz stone laid in a true bonding pattern (no stack bond)
- Trim boards between 3 and 6 inches at openings
- Parapet walls no more than 13 feet high (except for parapet walls that are gable ends)
- On common property lines, building walls that present a simple surface to the adjoining property (i.e., no jogs or pilasters greater than 8 inches in relief; consult WARC during the Building Placement Design phase of the ARCHITECTURAL REVIEW PROCEDURE). See Section Three: BUILDING PLACEMENT STANDARDS for height requirements.

## GENERAL

*Where visible from the STREET, only the following are permitted:*

- Steps encroaching up to 5 feet into the STREET RIGHT-OF-WAY (into the VERGE); however, such an encroachment must be submitted to the county for approval. Simple designs are encouraged; consult Windsor. (Village Fairway Houses, Lake Cottages, and Beach Cottages may not encroach into the STREET RIGHT-OF-WAY.)
- Chimneys encroaching up to 16 inches into the STREET RIGHT-OF-WAY (into the VERGE)
- Stucco chimneys with stucco, tile, stone, or cast-stone coping
- Horizontally consistent facade materials; to be reviewed by WARC

# WINDOWS AND DOORS

## ARCHITECTURAL STANDARDS

Windsor suggests that windows be operable so that rooms can be cross-ventilated and open to the tree-lined STREETS. Window panes are limited in size to create MUNTINS, an added level of detail that expresses the surface of the window, rather than the punched-out hole a large single sheet renders. Shutters are encouraged: they regulate the level of privacy a room has and the amount of tropical sun it receives, and their wood detailing adds architectural interest.

## MATERIALS

*Where visible from the STREET, only the following are permitted:*

- Clear glass with no more than 10 percent reduced-light transmission (except where required by WARC for privacy considerations)
- Solid-wood window frames, doors, shutters, and trim
- Weathershield® vinyl-clad sills and frames, equivalent or better, which have true divided lites, Flexichron painted wood sashes and brick molds
- Solid-wood garage doors; stiles and rails no less than 2¼ inches thick
- Wood that is painted or stained. Color must be approved by WARC; stain must approximate natural color or lighter. See "Trim," p. 2.12.
- On COMMON DRIVES where RIGHTS-OF-WAY are 24 feet, aluminum garage doors painted in a flat finish; see "Trim," p. 2.12. Design and color to be approved by WARC.
- Aluminum shutters*, subject to WARC approval, painted in a flat finish. See "Trim," p. 2.12.

  * Florida Shutter Company's aluminum Windsor Shutter®, equivalent or better, which has special frame treatment (welded corner joints) and shutter blades (flattened oval section ) or infill panels, has been approved. Stiles and rails must be given extra dimension to ensure rigidity and an acceptable aesthetic. Stiles and rails on gates and doors shall be no less than 2 inches deep by no less than 4 inches wide; on window shutters, no less than 1¼ by 3 inches.

## CONFIGURATIONS

*Where visible from the STREET, only the following are permitted:*

- Facades with fenestration less than 30 percent of their surface areas
- Square or vertically proportioned openings, no more vertical than a quadruple square (openings may be separated by MULLIONS)
- Openings for windows no larger than 4 feet horizontally by 10 feet vertically
- Openings for doors no larger than 6 feet horizontally by 10 feet vertically
- Square or vertically proportioned panes of glass (lites) no larger than 18 inches horizontally by 29 inches vertically (excepting Ocean Sites); horizontal and vertical MUNTINS (fanlights are prohibited)
- Square or horizontally proportioned transoms matching the width of corresponding doors or windows, but with square or vertically proportioned lites
- Windows with sills that project between 1 and 2 inches
- Windows and doors no less than 36 inches from building corners (excluding garage doors for the CARRIAGE HOUSE)
- Architraves (window and door frames) of a simple section and a constant dimension from the opening (no keystones)
- One circular or octagonal opening (glazed or unglazed) per house (including the CARRIAGE HOUSE)

- Two single-wide garage doors (each door no more than 10 feet wide) placed no less than 15 feet from the STREET and opening onto a gated auto-court, or one double-wide garage door (no more than 18 feet wide) placed no less than 15 feet from the STREET and opening onto a gated auto-court. Door patterns to be approved by WARC. For siting criteria, see Ancillary Structures, p. 2.9 and Section Three: BUILDING PLACEMENT STANDARDS.
- One golf-cart door no more than 7 feet wide, set no less than 15 feet from the STREET and opening onto a gated auto-court or COMMON DRIVE. Door pattern to be approved by WARC.
- A straight lintel or segmental arch over each garage door and golf-cart door
- Operable louvered, Bahama, or hurricane shutters sized to match openings

## OPERATIONS

*Where visible from the STREET, only the following are permitted:*

- Single-sash, double-sash, and fully operable casement windows
- Swinging garage doors (swing out from hinges at the jambs) or one-piece garage doors (a.k.a. sled doors; flip up overhead on tracks). On COMMON DRIVES, see Ancillary Structures, p. 2.9.
- Within 5 feet of common property lines, fixed and non-operable windows that are also subject to special requirements. See Privacy, p. 2.2.
- Bolted-on, removable hurricane shutters matching the color of the house, with only the mounting bolts visible when not installed. Shutters and channels may not be in place when hurricane warnings are not in effect. After a hurricane warning has passed, the shutters and channels must be taken down with reasonable speed; exceptions are shutters not visible from the STREET, such as those within private courtyards.

## GENERAL

Where visible from the STREET, all window, door, shutter, and gate designs must be approved by WARC (excepting elements visible only from within the lot). All materials must be identified on all drawings submitted to the REVIEW COMMITTEE.

Where visible from the STREET, wood or terra-cotta window boxes and metal flowerpot holders are permitted.

# Garden Walls and Fences

ARCHITECTURAL STANDARDS

At Windsor, GARDEN WALLS define and separate the community space of the STREET from the private space of the individual courtyard. These masonry walls give spatial form to the two realms, effectively defining them as exterior spaces or outdoor rooms—as *places*, which are what make Windsor such a comfortable, civil place to live. Fences also delineate communal and private areas, but in a more decorative and less opaque way.

The GARDEN WALL's stucco surface should be neither crude and rough nor mirror-smooth, but slightly irregular in showing the hand of the workman.

## MATERIALS

*Where visible from the STREET, only the following are permitted:*

- Stucco and stone GARDEN WALLS. For a stucco house, the GARDEN WALL must match the building walls. For an all or partially wood-clad house, the transition between the stucco or stone GARDEN WALL and the wood siding must be carefully detailed and shall be reviewed accordingly.
- Wood fences; pattern to be approved by WARC
- Wood or aluminum gates
- Ventilating panels of wood or aluminum louvers, "basket weave" brick, or approved options

## CONFIGURATIONS

*Where visible from the STREET, only the following are permitted:*

- Wall surfaces with a minimum overall opacity of 85 percent*
- Gated openings with a minimum overall opacity of 75 percent*; gate design to be approved by WARC
- Ventilating panels less than 10 square feet each, each panel no more squat than a horizontal triple square and with a minimum overall opacity of 50 percent*
- Between interior lot lines, ventilating panels that are no lower than 9 feet above the STREET elevation
- On common property lines, GARDEN WALLS that present a simple surface to the adjoining property (i.e., no jogs or pilasters greater than 8 inches in relief; consult WARC during the Sketch Review). See Section Three: BUILDING PLACEMENT STANDARDS for height requirements.

    * A single, large opening may not replace the maximum transparency allowed, nor may lowering the wall or fence to reduce the surface area. The design intent is to proportionally and aesthetically distribute the minimum level of opacity.

## GENERAL

*Where visible from the STREET, only the following are permitted:*

- On STREET-frontage lines in the VILLAGES, GARDEN WALLS with the following coping detail (pier and pilaster coping may be elaborated):



# BALCONIES, PORCHES, AND LOGGIAS

## ARCHITECTURAL STANDARDS

BALCONIES, PORCHES, and LOGGIAS belong to both the private space of the house and the community space of the STREET. Half inside and half outside, these architectural elements serve two vital purposes at Windsor: they enable residents to participate in the life of the STREET, and they allow the activities of the STREET to filter unobtrusively into the family house.

In addition, the materials, details, and configurations of BALCONIES, PORCHES, and LOGGIAS architecturally enrich the facades of their buildings.

## MATERIALS

*Where visible from the STREET, only the following are permitted:*

- Stone, cast stone, or stucco piers and brackets
- Wood posts, piers, and brackets
- Wood balustrades

## CONFIGURATIONS

*Where visible from the STREET, only the following are permitted:*

- Square or vertically proportioned BALCONY, PORCH, and LOGGIA openings (the space between posts or intercolumniation)
- Roofed BALCONIES, PORCHES, and LOGGIAS
- Piers no less than 12 by 16 inches
- Posts no less than 6 by 6 inches nominal, with no chamfering below 42 inches
- Posts and piers no taller than one story
- Balusters no greater than 2 inches by 2½ to 4½ inches on center and with clear spaces no greater than 3 inches; pattern to be approved by WARC
- Screens that enclose the PORCHES or LOGGIAS on Country Estates. The frames for the screens may not be visible from the STREET. Each frame must be mounted behind the PORCH posts or LOGGIA wall-structure.

## OPERATIONS

BALCONIES, PORCHES, and LOGGIAS shall not open toward private lots that are less than 28 feet away, measured at right angles. Along a COMMON DRIVE, this distance is 28 feet to the lot line with the COMMON DRIVE. See Privacy, p. 2.2.

## GENERAL

*Where visible from the STREET:*

- Cylindrical and/or double-height columns, posts, piers, and the Classical orders are reserved for CIVIC BUILDINGS. Except for houses along Savannah Place, which may have single-story cylindrical columns, these elements are prohibited on private houses (excepting their private courtyards).
- Required BALCONIES, PORCHES, and LOGGIAS shall be unenclosed.
- Nonrequired BALCONIES, PORCHES, and LOGGIAS may be shuttered; at least two-thirds of the shutters must be operable.

# ROOFS AND GUTTERS

## ARCHITECTURAL STANDARDS

Steeply pitched roofs in metal or wood are prominent features of the Windsor architectural style. The regularity of slopes and consistency of materials contribute to the architectural expression and coherence of Windsor.

## MATERIALS

*Where visible from the STREET, only the following are permitted:*

- Galvalume® (equivalent or better) or leaded copper, five-crimp or standing seam heavy gauge metal roofs; to be approved by WARC
- Cedar shingles approved by WARC
- Metal shingles also allowed for houses east of A1A
- Copper gutters and roof flashing for cedar roofs

## CONFIGURATIONS

*Where visible from the STREET, only the following are permitted:*

- Simple hipped or gabled roofs that are symmetrically pitched between 7:12 and 10:12
- "Skirted" or "flared" roof configurations; 3:12 minimum pitch for the flares
- Simple shed roofs, pitched between 3:12 and 8:12 and leaning against the principal building or GARDEN WALLS
- Eaves with a minimum depth of 30 inches for principal buildings and 20 inches for shed roofs and ancillary structures (where shed or ancillary building roofs abut adjacent lot lines, a parapet wall can be used). For dormers, BALCONIES, or buildings under 16 feet square, the eaves may be proportioned to the mass of the structure; subject to WARC approval.
- OPEN EAVES with rafter tails no less than 2 inches (horizontal) by 4 inches (vertical) nominal
- Soffited OPEN EAVES with outriggers no less than 3 inches (horizontal) by 4 inches (vertical) nominal
- Dormers no closer than 3 feet to the gabled ends of the building

*Where visible from the STREET, the following are prohibited:*

- Pediments and/or sculpture (except simple finials) above the eaves line
- Skylights
- Roof decks

## GENERAL

*Only the following are permitted:*

- Roof materials in their natural color (or as manufactured)
- Half-round gutters

Within the VILLAGES and on Ocean Sites (excluding Ocean Estates), the placement of dormers shall not be allowed to compromise the privacy of neighboring lots and houses and shall be reviewed accordingly.

# ANCILLARY STRUCTURES

## ARCHITECTURAL STANDARDS

Ancillary structures, including the CARRIAGE HOUSE, should be treated as extensions of the main house and are subject to the same ARCHITECTURAL STANDARDS and aesthetic criteria.

## MATERIALS

Material restrictions are the same as those for the principal structure.

Aluminum garage doors are allowed only on COMMON DRIVES where the RIGHTS-OF-WAY are 24 feet; door patterns to be approved by WARC.

## CONFIGURATIONS

Configuration and massing restrictions are the same as those for the principal structure.

The garage shall not open onto or within 15 feet of the STREET; a gated auto-court is required. For siting criteria see Section Three: BUILDING PLACEMENT STANDARDS.

If the lot borders a COMMON DRIVE, the garage or its auto-court gate must open onto the COMMON DRIVE. For siting criteria, see Section Three: BUILDING PLACEMENT STANDARDS.

*Only the following are permitted:*
- Two single-wide garage doors (each door no more than 10 feet wide) opening onto a COMMON DRIVE or placed no less than 15 feet from the STREET and opening onto a gated auto-court. Door patterns to be approved by WARC.
- One double-wide garage door (no more than 18 feet wide) opening onto a COMMON DRIVE where its RIGHT-OF-WAY is 24 feet or placed no less than 15 feet from the STREET and opening onto a gated auto-court. Door pattern to be approved by WARC.
- One golf-cart door (no more than 7 feet wide) opening onto the COMMON DRIVE or placed no less than 15 feet from the STREET and opening onto a gated auto-court. Door pattern to be approved by WARC.
- Straight lintels or segmental arches over garage and golf-cart doors

## OPERATIONS

*Only the following are permitted:*
- Swinging garage doors (swing out from hinges at the jambs) or one-piece garage doors (a.k.a. sled doors; flip up overhead on tracks). Design to be approved by WARC.
- On COMMON DRIVES, sectional panel garage doors (raised panels are prohibited). Design to be approved by WARC.

## GENERAL

Within the VILLAGES and on Ocean Sites (excluding Ocean Estates), no window, BALCONY, PORCH, LOGGIA, and dormer will be allowed to compromise the privacy of neighboring lots and houses and shall be reviewed accordingly. The privacy of neighboring primary residences shall take precedence over potential views from ancillary structures. See Privacy, p. 2.2.

# EXTERIOR LIGHTING

## ARCHITECTURAL STANDARDS

Simplicity of form is the guiding principle for all building accessories. Materials and configurations should be those that will weather well in Windsor's tropical climate and coastal environment.

## MATERIALS

*Where visible from the STREET, only the following are permitted:*

- Incandescent or halogen elements
- Lights no brighter than the Windsor STREET lights
- STREET-side lights that are incandescent, no brighter than the Windsor STREET lights, and not used to illuminate exterior walls

## CONFIGURATIONS

WARC can provide the specifications for pre-approved and existing light fixtures at Windsor. All equivalent or higher quality light fixtures must be submitted to WARC for approval.

# Mechanical Equipment and Exterior Hardware

## ARCHITECTURAL STANDARDS

To preserve the visual integrity of Windsor, mechanical equipment should not be visible from the STREET, but hidden behind GARDEN WALLS or within auto-courts. For sites with COMMON DRIVES, mechanical equipment and utility boxes should be located near and readily accessible from the COMMON DRIVES.

## MATERIALS

The style, size, and material for house numbering and lettering shall match Windsor's standard. Consult WARC.

## OPERATIONS

*Where visible from the STREET, only the following are permitted:*
- Solid brass, bronze, or brushed chrome exterior hardware

*The following shall be located in the auto-court or be accessible from a COMMON DRIVE:*
- Electric and gas company meters or boxes
- Telephone company boxes
- Waste bins

*The following shall not be visible from the STREET or from within neighboring courtyards (including courtyards across the STREET):*
- Air conditioning compressors, electric and gas meters
- Waste bins, above-ground storage tanks, artificial vegetation, basketball boards, and other sports equipment
- Small satellite dishes*

   * The Sony 18-inch-diameter satellite dish, equivalent or smaller, satisfies WARC's standard for small satellite dishes.

*The following shall not vent into the STREET, neighboring courtyards, or GARDEN EASEMENTS:*
- Stoves, laundry equipment, etc.†

   † All roof vents must be on the interior side of the roof ridge.

## GENERAL

If a transformer easement is located within a lot, then the lot OWNER is responsible for financing and building the enclosing vault and its gate. If the transformer easement is only partially on the lot, then the lot OWNER shares this responsibility with the OWNER of the adjacent lot. Each OWNER shall build that portion of the vault on his or her lot and shall be responsible for one-half of the double gate. Consult WARC.

# BUILDING AND GARDEN WALL COLORS

## ARCHITECTURAL STANDARDS

To preserve the aesthetic coherence of Windsor's VILLAGE, Fairway, and Ocean Houses, exterior wall colors are limited to a narrow range of colors found in the immediate natural landscape. Accentuations in color are allowed on the trim of buildings, in hues suited to the tropics.

## MATERIALS

### Exterior Walls

*Only the following are permitted:*

- Stucco exterior building walls and GARDEN WALLS painted the same color, selected from colors approved by WARC
- Colors selected from Windsor's palette of warm, neutral colors (cool hues—e.g., blues, greens—are prohibited). Stronger colors, such as terra cotta or ochre, are limited to a lime-based formula, equivalent or better.
- Wood siding, stucco building walls, and GARDEN WALLS painted the same color
- Wood siding painted a different color, but in a similar hue, than the stucco building walls and GARDEN WALLS; to be approved by WARC
- Wood siding stained to its natural color or lighter, or bleached to a light hue (dark woods and stains are prohibited)

### Trim

A greater range of paints colors for doors, windows, shutters, gates, eaves, window-screen frames, and other trim is allowed, but must be submitted to WARC for approval. Simple color schemes are recommended.

Trim may be stained to its natural color or lighter, or bleached to a light hue (dark woods and stains are prohibited).

*Only the following are permitted:*

- Window-screen frames matching the color or stain/bleach of the window trim
- Aluminum shutters and gates painted in a flat finish (brushed aluminum is prohibited)

## CONFIGURATIONS

*Only the following is permitted:*

- Corner boards for wood siding painted the same color as the siding

## GENERAL

Before being applied, exterior wall and trim colors must be submitted to WARC for approval. Proposed colors must be identified on ¼-inch scale building elevations, both rendered in color and specified in notation. Sample chips of proposed colors are also required.

Where color selection is more problematic or must be made in consideration of nearby existing houses, WARC will require samples applied on site.

# BUILDING PLACEMENT STANDARDS
## THE WINDSOR CODE — SECTION THREE

### GENERAL DESCRIPTION

The Windsor BUILDING PLACEMENT STANDARDS have two goals:
1.  To create private outdoor spaces (courtyards and gardens)
2.  To create community spaces (STREETS, squares, and greens)

Excluding Country and Ocean Estates, the BUILDING PLACEMENT STANDARDS for all other sites include the following fundamental criteria:
1.  Building walls and GARDEN WALLS are built to the STREET (on the property line) and, generally, without setbacks.
2.  Views from all houses are directed into STREETS, squares, or private courtyards, not into adjacent lots.
3.  Houses line their lot frontages and enclose private courtyards. (In general, houses are no more than 35 feet deep to facilitate cross-ventilation.)

The prescriptions of the BUILDING PLACEMENT STANDARDS are determined by the circumstances of the building site.

*Note: Variances to these standards may be granted by WARC where necessary to accommodate the building adjacencies inherent in the Windsor MASTER PLAN.*

### HEIGHT SPECIFICATIONS

1.  The height of a building is measured relative to the adjacent STREET level and a specified point on the building. Maximum building height is measured to the eaves of the building. (For lots outside the VILLAGES, there is a superseding county height limit of 35 feet to the midpoint of the roof slope, which may be a factor. Consult WARC.)
2.  At least 20 percent of the building footprint shall be no less than 20 feet to the eaves or, where required by the REGULATING PLAN, two stories. This 20 percent shall be built along the MAJOR STREET (usually, the widest RIGHT-OF-WAY; see Glossary, p. 1.7), unless designated otherwise on the REGULATING PLAN.
3.  Except for garages and entry vestibules, ground floors shall be 3 feet higher than the adjacent STREET.
4.  In the VILLAGES, the minimum height for eaves along STREETS or COMMON DRIVES is $10\frac{1}{2}$ feet.
5.  The threshold of auto and golf-cart garage floors shall be approximately 4 inches higher than the adjacent STREET or COMMON DRIVE.

### SITING SPECIFICATIONS

1.  The building shall be built along the MAJOR STREET (usually, the widest RIGHT-OF-WAY; see Glossary, p. 1.7), unless designated otherwise on the REGULATING PLAN.
2.  For corner lots:
    a.  The building shall be built to the corner, except for Sideyard House sites and where designated otherwise on the REGULATING PLAN.
    b.  The STREET frontage includes the lot's frontages on all STREETS. A lot bound by three STREETS may be granted a variance from the 50 percent minimum frontage requirement. Consult WARC.
    c.  At the intersection of a STREET and a COMMON DRIVE, the corner of the lot shall be occupied by a building that has a minimum height of $10\frac{1}{2}$ feet to the eaves and a minimum footprint of 88 square feet.
3.  An auto-court gate may replace up to 15 feet of the GARDEN WALL STREET frontage requirement, provided that it is at least 75 percent opaque. See ARCHITECTURAL STANDARDS: GARDEN WALLS and Fences, p. 2.6.
4.  A pedestrian-entry gate may replace up to 6 feet of the GARDEN WALL STREET frontage requirement.
5.  At least 35 percent of the lot area shall not be built upon.
6.  GARDEN WALLS and CARRIAGE HOUSES along COMMON DRIVES may be set back to facilitate garage access.
7.  County regulations do not permit any part of a structure to overhang or encroach on other private property. Where building walls are set back from a common lot line to provide space for roof eaves, a GARDEN EASEMENT shall be granted to the adjoining lot OWNER for the use, landscaping, and maintenance of the resulting area.

### ELEMENTS SPECIFICATIONS

1.  Each building facade along the STREET shall be composed as a single plane, interrupted only by BALCONIES, PORCHES, LOGGIAS, and a minimum number of jogs (no more than 8 inches each) in the building wall.
2.  Within the VILLAGES, encroachments into the STREET RIGHT-OF-WAY of up to 16 inches for chimneys and 5 feet for steps are permitted. A county permit is required; consult WARC.
3.  Bay windows are not permitted on the STREET side of a building.
4.  Enclosed, covered parking shall be provided for a minimum of two cars within the defined buildable area.
5.  The garage shall not open onto or be within 15 feet of a STREET; a gated auto-court is required.
6.  Where a lot borders a COMMON DRIVE, the garage or its auto-court gate must open onto the COMMON DRIVE.
7.  The auto-court gate and the pedestrian-entry gate must be designed to remain closed when not in use.

# Building Placement Standards
## Country Estate Sites — Type CE "A"

Country Houses are large, one- or two-story, freestanding houses bordering the golf course, evenly aligned and visually linked by similar PORCHES and low masonry walls facing the fairways.



### Height

*Maximum:*

The house shall be no higher than 35 feet to the midpoint of its roof (as required by county regulations). Ancillary structures shall be no higher than 20 feet to the eaves.

*Required:*

A minimum 6-foot-high hedge shall be placed on common lot lines and STREET frontage lines (excluding the golf-side frontage line).

A 4-foot-high masonry wall shall be built along the golf-side frontage line.



### Siting

*Required:*

The REQUIRED BUILDING LINE is 40 feet from the golf-side frontage line.

The house and ancillary structures shall be confined to the hatched area of the lot. Except for overhanging eaves, no building or parts of a building (e.g., posts, piers) may occupy any of the remaining lot area.

### Elements

*Required:*

A PORCH or ground-floor LOGGIA is required along the golf-side REQUIRED BUILDING LINE. The PORCH or LOGGIA shall be at least 7 feet deep and at least 30 feet wide.

© 1997 R Geoffrey Ferrell & Associates and Duany Plater-Zyberk & Company. All rights reserved

# The Windsor Code

## Architectural Review Procedure
### SECTION FOUR

# Windsor

*The Windsor Code*, which includes a REGULATING PLAN, ARCHITECTURAL STANDARDS, BUILDING PLACEMENT STANDARDS, LANDSCAPING STANDARDS, and an ARCHITECTURAL REVIEW PROCEDURE, has been prepared for use in the Windsor community. This manual may not be photocopied, in whole or in part, without the expressed written permission of Windsor Properties, a Florida General Partnership, and may not be used for any other purposes whatsoever. All copyrights and publishing rights are exclusively reserved by the developer, except for the BUILDING PLACEMENT STANDARDS, which are jointly reserved by R. Geoffrey Ferrell & Associates and Duany Plater-Zyberk & Company, Architects and Town Planners.

Under the terms of the *Declaration of Covenants, Conditions, and Restrictions for Windsor*, *The Windsor Code* is binding on all parties having an interest in any portion of the community and each OWNER is required to comply with the requirements set forth herein. The developer and the Board of Directors of the community may, from time to time, update and revise *The Windsor Code*. This version of the *Code* was prepared and edited by Richard Shearer, and includes renderings by Charles Barrett, Dana Little, and James Dougherty

©1997 Windsor Properties, Inc. All rights reserved



# ARCHITECTURAL REVIEW PROCEDURE

# ARCHITECTURAL REVIEW PROCEDURE
## THE WINDSOR CODE
### SECTION FOUR



Architectural Review Procedure ........................................................................................................ 4.2
Review Procedure for Each Design Phase ....................................................................................... 4.5
Review Application Forms
    *Form A(1): Pre-Design Code Review: Agreement to Work Within The Windsor Code*
    *Form A(2): Agreement to Work Within The Windsor Code*
    *Form B: Sketch Review: Application for Building Placement Design Review*
    *Form C: Major Review: Application for Schematic Design Review*
    *Form D: Final Review: Application for Construction Drawings Review*
    *Form E. Application for Landscape Design Review*
    *Form F: Application to Start Construction*
    *Form G: Request for Final Inspection*
Windsor Architectural Review Committee ........................................................................................ 4.7

# ARCHITECTURAL REVIEW PROCEDURE

## THE WINDSOR ARCHITECTURAL REVIEW PROCEDURE AND THE WINDSOR TOWN-PLANNER

Because Windsor's siting conditions and design standards for buildings are unique, Windsor created an ARCHITECTURAL REVIEW PROCEDURE to facilitate and ensure compliance with *The Windsor Code*. The ARCHITECTURAL REVIEW PROCEDURE includes the following design phases: Pre-Design Code Review (Agreement to Work Within *The Windsor Code*); Sketch Review (Building Placement Design); Major Review (Schematic Design); Final Review (Construction Drawings); Construction; and Final Inspection. Each phase includes an application form that lists the required drawings, documents, or other items to be submitted to WARC for its review. Applications and submissions for each design phase—Sketch, Major, and Final Reviews—must follow the review procedure described on page 4.5.

Windsor has a TOWN-PLANNER to guide OWNERS and their architects through all phases of the ARCHITEC-TURAL REVIEW PROCEDURE. The role of the TOWN-PLANNER is to answer any questions regarding *The Windsor Code* and to assist OWNERS and their architects in the design of houses appropriate to Windsor. Windsor recommends that OWNERS and their architects consult the TOWN-PLANNER regularly. The TOWN-PLANNER can expedite the design process and ARCHITECTURAL REVIEW PROCEDURE by providing appropriate precedents and feasible designs for houses that meet the *Code*. However, the TOWN-PLANNER cannot grant variances to the *Code*. Only the REVIEW COMMITTEE can grant variances, and only where unique lot conditions and adjacencies—as laid out in the Windsor MASTER PLAN—prevent compliance with *The Windsor Code*.

## ARCHITECT QUALIFICATIONS FOR WINDSOR

Windsor can show lot OWNERS the work of architects who understand *The Windsor Code* and its prescribed style of architecture. Windsor also welcomes the opportunity to work with any architect the lot OWNER retains, provided the architect agrees to work within the standards of the *Code*.

## PRE-DESIGN CODE REVIEW
## FORM A: AGREEMENT TO WORK WITHIN THE WINDSOR CODE

Once the OWNER has selected an architect, both must sign *Form A(1): Pre-Design Code Review: Agreement to Work Within The Windsor Code*. Before beginning the house design, the architect must submit *Form A(1)* to the TOWN-PLANNER at the Pre-Design Code Review, which is an introductory meeting to discuss *The Windsor Code* and the specifics of the OWNER's site. The purpose of this review is to help the architect avoid investing time in designing a house inappropriate to Windsor. It also marks the beginning of the ARCHITECTURAL REVIEW PROCEDURE, which is not so much a formal procedure as it is a proven process for creating buildings that comply with the *Code*.

Although the OWNER's landscape professional is not required to attend the Pre-Design Code Review, he or she must sign and submit *Form A(2)* to WARC before beginning to design. For questions regarding *The Windsor Code* and its LANDSCAPING STANDARDS or for informal reviews, Windsor encourages the landscape professional to consult with the TOWN-PLANNER.

Case 2:04-cv-14244-DMM   Document 1-3   Entered on FLSD Docket 08/27/2004   Page 68 of 100

## SKETCH REVIEW
## FORM B: BUILDING PLACEMENT DESIGN REVIEW

Following the Pre-Design Code Review the building placement design of the house begins. For further clarifications of *The Windsor Code* and building placement issues, the architect can meet informally with the TOWN-PLANNER or initiate a "graphic conversation" by faxing sketches to the TOWN-PLANNER, who will respond within five working days. Through this and all phases of the ARCHITECTURAL REVIEW PROCEDURE, Windsor encourages OWNERS and their architects to consult the TOWN-PLANNER for informal reviews of design development.

Once the design for the house has taken shape and the basic building placement requirements have been fulfilled, the OWNER and architect can apply for a formal review from WARC by filing *Form B: Sketch Review: Application for Building Placement Design Review*. The OWNER and architect are not bound to the design or configuration submitted for this review and may propose a completely different scheme for the Major Review. What is most important is that the architect become familiar with the design issues regarding building placement at minimal cost to the OWNER.

## MAJOR REVIEW
## FORM C: SCHEMATIC DESIGN REVIEW

All parts of *The Windsor Code* must be addressed in the Major Review. Scaled drawings that accurately illustrate the schematic design of the house are required with *Form C: Major Review: Application for Schematic Design Review*. Once the schematic design has been approved, any element that is subsequently changed or modified must be pointed out and resubmitted to WARC for approval. If such a change is clearly within the *Code* and consistent with the approved schematic design, the TOWN-PLANNER may waive a full WARC meeting and grant approval, allowing the architect to continue with construction drawings.

## FINAL REVIEW:
## FORM D: CONSTRUCTION DRAWINGS REVIEW
## FORM E: LANDSCAPE DESIGN REVIEW

Four sets of construction drawings, including exterior building elevations, site and roof plans, detail drawings, site sections, and selected materials, must be submitted to WARC for the Final Review with *Form D: Final Review: Application for Construction Drawings Review*. Any element changed or modified since the Major Review must be listed on *Form D* and identified and highlighted on the submitted drawings. WARC will review the plans and return one set of plans with comments within 30 days.

Four sets of the landscape plan are required for the Final Review. Concurrent with the filing of *Form D*, *Form E: Application for Landscape Design Review* and its required documents must be submitted to WARC.

The color scheme for the house and ancillary structures may be submitted with the Final Review submissions or after construction has begun.

Any element changed or modified after the construction drawings have been approved must be highlighted on revised construction drawings and listed on *Form D*, which must be resubmitted to WARC for approval. If such a change is clearly within the *Code* and consistent with the approved schematic design, the TOWN-PLANNER may waive a full WARC meeting and grant approval.

## BUILDER QUALIFICATIONS FOR WINDSOR

A list of previously approved builders who have met requirements regarding financial stability and quality of workmanship, and who have custom building experience in the Vero Beach area, is available from the Windsor Administrative Office. If the OWNER is considering a builder who is not on this list, a specific approval process must be followed, which is outlined in a separate *Builder's Guidelines Manual & Application*, available on request.

The OWNER may want his or her architect to arrange a contractual agreement between the OWNER and the builder.

## FORM F: CONSTRUCTION APPLICATION
## THE WARC BUILDING PERMIT

The Pre-Design Code Review, all three Design Reviews, and the Landscape Design Review must be completed before the builder may submit *Form F: Application to Start Construction* to WARC. When filing *Form F*, the builder must include the required construction deposit. Construction may begin only after WARC has verified the successful completion of the five reviews by returning *Form F*, signed by a WARC representative, with a certified *WARC Building Permit*. Before starting construction, however, the builder must also obtain building permits from the Indian River County Building Department and any other agencies having jurisdiction over required county or state permits.

During construction the *WARC Building Permit* must be posted in a conspicuous location visible from the STREET and protected from the elements.

## INSPECTION(S)
## FORM G: FINAL INSPECTION

To ensure compliance with *The Windsor Code* and the approved house plan, WARC may perform periodic site inspections as follows:

A.  The OWNER may be asked to provide a string stake-out of the lot, building wall, and GARDEN WALL lines. All trees (excluding citrus) to be removed must be indicated. The TOWN-PLANNER or another WARC member will inspect for conformity with the approved plans before granting approval for construction to begin.

B.  After *Form G: Request for Final Inspection* has been submitted, the TOWN-PLANNER or another WARC member will visit the site and verify compliance with the drawings, including landscaping, approved at the Final Review. No house within the community may be occupied until WARC has given its final approval.

# REVIEW PROCEDURE FOR EACH BUILDING DESIGN PHASE

The WARC procedure for reviewing each application and submitted drawings to the Sketch, Major, and Final Reviews* is presented below.

1. The application must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting.

2. The OWNER's architect may attend or may be requested to attend the WARC meeting to present and explain the proposal.

3. WARC reviews the submitted proposal and rules according to a simple majority.

4. WARC notifies the architect within 30 days whether the application has been approved, approved with conditions, or rejected. All reasons for rejection will be cited. The failure of WARC to respond within 30 days does not constitute an automatic approval.

5. If the application inadequately describes the requested change or fails to include the required drawings, then WARC will defer approval. All requests for elements, materials, and configurations at variance with *The Windsor Code* must be made in writing to WARC, which shall act on such requests pursuant to the provisions of Article XI, Section 4 of the *Declaration of Covenants, Conditions, and Restrictions for Windsor*. WARC also reserves the right (but is not obligated) to consult with adjacent or nearby lot OWNERS who may be affected by the variance request.

6. If the application has been rejected and the architect does not understand the cited reasons, the architect should contact WARC. Buildings at variance with the *Code* will not be considered approved by WARC if the parts or items at variance were inaccurately and/or not clearly shown in the review submission. In such an event, or, if for any other reason, the OWNER or his or her agents disregard or fail to follow the procedures or requirements of *The Windsor Code*, then the Windsor Community Association or Windsor Properties may seek injunctive relief in the Circuit Court for Indian River County. The prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, including appellate fees and costs.

7. If the rejected application involves minor discrepancies with *The Windsor Code*, then WARC can clarify the suggested solutions to the OWNER and his or her architect. An application with modifications may then be submitted for review.

8. If the application with modifications is rejected, and the architect does not wish to make an informal appeal to WARC, then a formal appeal in writing may be made to WARC. This appeal must be made within 30 days of the date the architect is notified of WARC's decision denying the application with modifications.

9. The formal appeal involves a thorough review of the application by WARC. The architect is informed of WARC's decision within 10 days of the appeal review.

10. An approved application is valid for 12 months after the date of the approval. If the OWNER fails to submit an application for the next review phase or fails to start construction within a year, then the previously approved application and design must be resubmitted to WARC for review.

* Drawings submitted to the Windsor TOWN-PLANNER for informal critiques during any one of the design phases do not require special forms or procedures.

# FORM A(1): PRE-DESIGN CODE REVIEW

## AGREEMENT TO WORK WITHIN
## THE WINDSOR CODE

### TO BE COMPLETED BY THE OWNER AND THE ARCHITECT

| | | | |
|---|---|---|---|
| OWNER | _____ | Block | _____ |
| Architect | _____ | Lot | _____ |

Windsor is being built with several objectives in mind. The first is to create a carefully planned community consisting of a CENTRAL VILLAGE and a SOUTH VILLAGE, each with memorable STREETS and squares, complemented by detached houses along the Atlantic Ocean and on the perimeter of the Windsor Golf Course. The second is to provide a variety of building configurations, allowing lot OWNERS to create architecturally significant houses with unique interior spaces and private gardens. The third is to make sure that the architecture of each house contributes to making Windsor a coherent, unified whole.

To achieve these goals, an unadorned, unpretentious style of architecture was created for Windsor. Often described as Anglo-Caribbean, this unique style of architecture uses simple construction details and structural elements to create its aesthetic effect, not applied ornament. Refined simplicity and restrained dignity are the hallmarks of this regional style, whose common use unites all of Windsor's buildings into a visually compelling composition.

The distinctive features of the Windsor architectural style are the following:

1. Steeply pitched wood or metal roofs
2. OPEN EAVES that are deep and have exposed rafter tails
3. Vertical proportions for windows, doors, and the spaces between posts or piers
4. BALCONIES cantilevered over the STREET
5. Windows with small panes of glass
6. Exterior building walls in warm, neutral colors

To secure the common use of this architectural style and to assist lot OWNERS in the planning and construction of their homes, Windsor's town planners created *The Windsor Code*, which includes a REGULATING PLAN, ARCHITECTURAL STANDARDS, BUILDING PLACEMENT STANDARDS, ARCHITECTURAL REVIEW PROCEDURE, and LANDSCAPING STANDARDS.

By signing below, the OWNER and the architect agree to abide by the letter and spirit of the *Code* with the full understanding that each house plays a critical role in the making of complete and coherent VILLAGES. To make sure that the house conforms to *The Windsor Code*, the OWNER and the architect also agree to follow the ARCHITECTURAL REVIEW PROCEDURE by submitting its proposed design to WARC for Sketch, Major, and Final Reviews.

Before beginning the house design, the architect must submit this letter of agreement to the TOWN-PLANNER at the Pre-Design Code Review.

| | | | |
|---|---|---|---|
| OWNER's Signature | _____ | Date | _____ |
| Architect's Signature | _____ | Date | _____ |
| TOWN-PLANNER's Signature | _____ | Date | _____ |

10.01.97

# FORM A(2)

## AGREEMENT TO WORK WITHIN
## THE WINDSOR CODE

### TO BE COMPLETED BY THE LANDSCAPE PROFESSIONAL

OWNER _____    Block _____

Landscape                                   Lot _____
Professional _____

Windsor is being built with several objectives in mind. The first is to create a carefully planned community consisting of a CENTRAL VILLAGE and a SOUTH VILLAGE, each with memorable STREETS and squares, complemented by detached houses along the Atlantic Ocean and on the perimeter of the Windsor Golf Course. The second is to provide a variety of building configurations, allowing lot OWNERS to create architecturally significant houses with unique interior spaces and private gardens. The third is to make sure that the architecture of each house contributes to making Windsor a coherent, unified whole.

To achieve these goals, an unadorned, unpretentious style of architecture was created for Windsor. Often described as Anglo-Caribbean, this unique style of architecture uses simple construction details and structural elements to create its aesthetic effect, not applied ornament. Refined simplicity and restrained dignity are the hallmarks of this regional style, whose common use unites all of Windsor's buildings into a visually compelling composition.

To secure the common use of this architectural style and to assist lot OWNERS in the planning and construction of their homes, Windsor's town planners created *The Windsor Code*, which includes a REGULATING PLAN, ARCHITECTURAL STANDARDS, BUILDING PLACEMENT STANDARDS, and an ARCHITECTURAL REVIEW PROCEDURE.

To foster a landscape aesthetic in keeping with Windsor's natural surroundings and complementary to its architecture, Windsor created LANDSCAPING STANDARDS as a supplement to the ARCHITECTURAL STANDARDS. At Windsor, the landscaping of STREETS is intended to be simple yet refined, with trees lining the STREETS, vines climbing up building walls, and lush plants spilling over the GARDEN WALLS of private residences. The purpose of the LANDSCAPING STANDARDS is to make sure that this aesthetic is properly implemented. For individual lots, only trees, vines, and plants visible from the STREET are regulated by its standards. To assist OWNERS and their landscape professionals in the selection of species indigenous or appropriate to Windsor's unique climate, both tropical and temperate, Windsor compiled the Windsor Recommended Plant List as part of these standards.

By signing below, the landscape professional agrees to abide by the letter and spirit of the *Code* with the full understanding that each house plays a critical role in the making of complete and coherent VILLAGES. To make sure that the house's landscape design conforms to *The Windsor Code* and its LANDSCAPING STANDARDS, the landscape professional also agrees to follow the ARCHITECTURAL REVIEW PROCEDURE by submitting the proposed landscape design to WARC for the Final Review.

Before beginning the landscape design, the landscape professional must submit this letter of agreement to the TOWN-PLANNER.

Landscape
Professional's
Signature _____    Date _____

TOWN-PLANNER's
Signature _____    Date _____

10.01.97

# FORM B: SKETCH REVIEW

## APPLICATION FOR
## BUILDING PLACEMENT DESIGN REVIEW

### TO BE COMPLETED BY THE ARCHITECT

OWNER _____          Block _____
                                                Lot   _____

Architect   _____

Firm        _____

Address     _____
            _____

Telephone  _____      Telefax  _____

Before this application may be filed, the architect must have already signed *Form A(1): Agreement to Work Within The Windsor Code* and submitted it to the TOWN-PLANNER at their Pre-Design Code Review meeting.

Has the architect visited the site?          [ ] Yes          [ ] No

On the reverse side, list any questions about or possible variances with *The Windsor Code. Only variances with the Code granted by WARC in writing shall be considered official.*

The Sketch Review will be completed when the following issues have been addressed in the drawings:

Building placement on the lot, with appropriate dimensions shown for

- Building height to eaves
- GARDEN WALL heights
- Building setbacks and depths
- BALCONY, PORCH, and LOGGIA locations
- Window locations (essential for privacy concerns)

Submit four sets of the following drawings on sheets of 11 x 17 inch paper:

⅟₁₆-inch scale   [ ]  Elevation(s)
                 [ ]  Site plan, including area within 50 feet (within constraints of 11 x 17 inch paper)

⅟₃₀-inch scale   [ ]  Footprint plan on the Windsor REGULATING PLAN (prefer drawing directly on photocopy of the REGULATING PLAN)

*WARC approval cannot be granted unless all required documents are submitted.*

Submitted by _____

Signature   _____          Date  _____

This application and all required drawings must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting. Consult WARC.

Submit to:   Windsor Architectural Review Committee
             3125 Windsor Boulevard
             Vero Beach, Florida   32963

(Cut here)

10.01.97

# FORM C: MAJOR REVIEW

### APPLICATION FOR
### SCHEMATIC DESIGN REVIEW

## TO BE COMPLETED BY THE ARCHITECT

OWNER _____    Block _____

Lot _____

Architect _____

Firm _____

Address _____

Telephone _____  Telefax _____

Check one   [ ]  Application for Major Review (schematic design)

           [ ]  Modification of a previously approved schematic design

On the reverse side, list and explain anything that may be at variance with *The Windsor Code*. (Potential variances not clearly identified or illustrated shall not be considered approved.) If this is a modification of a previously approved schematic design, explain the change and include appropriate drawings. *Only variances with the Code granted by* WARC *in writing shall be considered official.*

Submit four sets of the following drawings on separate sheets of 11 x 17 inch paper:

⅛-inch scale   [ ]  East elevation(s)       [ ]  Floor plans

               [ ]  West elevation(s)

               [ ]  North elevation(s)     Optional

               [ ]  South elevation(s)     [ ]  Materials list, keyed to elevations

1/16-inch scale   [ ]  Site plan, including buildings and land within 30 feet and any landscape elements visible from the STREET (within constraints of 11 x 17 inch sheet)

1/30-inch scale   [ ]  Roof or footprint plan on the Windsor REGULATING PLAN (prefer drawing directly on photocopy of the REGULATING PLAN)

¼-inch scale   [ ]  Exterior building element details, including OPEN EAVES, PORCHES, BALCONIES, minimum LOGGIAS, and shutters

1/16-inch scale   [ ]  Model showing buildings, GARDEN WALLS, and pool (white Strathmore with photocopy-reduced elevations)

*WARC approval cannot be granted unless all required documents are submitted.*

Submitted by _____

Signature _____  Date _____

This application and all required drawings must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting. Consult WARC.

Submit to:   Windsor Architectural Review Committee

            3125 Windsor Boulevard

(Cut here)

# FORM D: FINAL REVIEW

## APPLICATION FOR
## CONSTRUCTION DRAWINGS REVIEW

### TO BE COMPLETED BY THE ARCHITECT

OWNER _____    Block _____

Architect _____    Lot _____

Firm _____

Address _____

Telephone _____    Telefax _____

Check one    [ ]   Application for Final Review

           [ ]   Modification of approved construction drawings or of the existing building

On the reverse side, list and explain anything that may be at variance with *The Windsor Code* or with previous approvals. *Only variances with the Code granted by WARC in writing shall be considered official.*

Submit four sets of the following drawings on separate sheets of 24 x 36 inch paper:

| | | |
|---|---|---|
| ⅛-inch scale (minimum) | [ ]  Floor plans* | *Include all vents, breathers, drains, and sumps |
| ¼-inch scale | [ ]  East elevation(s)* | [ ]   Materials list, keyed to elevations |
| | [ ]  West elevation(s)* | |
| | [ ]  North elevation(s)* | Optional |
| | [ ]  South elevation(s)* | [ ]   Color scheme, rendered and noted on elevations; |
| | [ ]  Two site sections | include color samples |
| ½-inch scale (minimum) | [ ]  External building element details, including OPEN EAVES, PORCHES, BALCONIES, LOGGIAS, and shutters | |
| ⅟₃₀-inch scale | [ ]  Roof or footprint plan on the Windsor REGULATING PLAN (prefer drawing directly on photocopy of the REGULATING PLAN | |

Provide the following information on the house (include the CARRIAGE HOUSE):

Total square footage _____    Air-conditioned sq ft _____    Non-air-conditioned sq ft _____

Number of bedrooms_____    Number of baths _____    Swimming pool  [ ] yes    [ ] no

Submit *Form E: Application for Landscape Design Review* and required documents with this application.

*WARC approval cannot be granted unless all required documents are submitted.*

Submitted by _____

Signature _____    Date _____

This application and all required drawings must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting. Consult WARC.

Submit to:    Windsor Architectural Review Committee
               3135 Windsor Boulevard

# FORM E

## APPLICATION FOR
## LANDSCAPE DESIGN REVIEW

### TO BE COMPLETED BY THE LANDSCAPE PROFESSIONAL

OWNER _____     Block _____

Landscape                                                      Lot _____
Professional _____

Firm _____

Address _____

_____

Telephone _____ Telefax _____

Before this application may be filed, the architect must have already signed *Form A(2): Agreement to Work Within The Windsor Code* and submitted it to the TOWN-PLANNER.

Check one     [ ]  Application for Landscape Design Review*
              [ ]  Modification of a previously approved landscape design

* The Application for Landscape Design Review must be filed when *Form D: Final Review: Application for Construction Drawings Review* is submitted.

On the reverse side, list and explain anything that may be at variance with *The Windsor Code* and/or with previous approvals. *Only variances with the Code granted by WARC in writing will be considered official.*

Submit four copies of the following:

       [ ]  Plant list (species and common names), keyed to landscape site plan and elevations

Submit four sets of the following drawings on separate sheets of 24 x 36 inch paper:

⅛-inch scale   [ ]  Landscape site plan, including the STREET-space 20 feet into adjacent community areas (not private lots) and up to the center line of adjacent STREETS. Render and identify all sufficiently dimensioned plants in the VERGE and all courtyard trees and climbing vines visible from the STREET or the COMMON DRIVE.

⅛-inch scale   Elevations as seen from adjacent STREETS and the COMMON DRIVE. Render and identify all sufficiently dimensioned plants in the VERGE and all courtyard trees and climbing vines visible from the STREET or the COMMON DRIVE. Check applicable drawings or mark "N/A":

       [ ]  North elevation          [ ]  East elevation
       [ ]  South elevation          [ ]  West elevation

*WARC approval cannot be granted unless all required documents are submitted.*

Submitted by _____

Signature _____     Date _____

This application and all required drawings must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting. Consult WARC.

Submit to:     Windsor Architectural Review Committee
              3125 Windsor Boulevard

*(Cut here)*

Case 2:04-cv-14244-DMM   Document 1-1   Entered on FLSD Docket 08/27/2004   Page 77 of 100

# FORM F

## APPLICATION TO START CONSTRUCTION

### TO BE COMPLETED BY THE BUILDER

OWNER _____        Block _____
                                            Lot _____

Builder _____

License No. _____

Address _____

_____

Telephone _____ Telefax _____

Contact _____

Construction Deposit: $5,000 US

Make check payable to: *Windsor Architectural Review Committee*

Submitted by _____

Signature _____        Date _____

### TO BE COMPLETED BY THE WINDSOR ARCHITECTURAL REVIEW COMMITTEE

Review Phases successfully completed:

|  |  |  |  |  |
|---|---|---|---|---|
| Pre-Design Code Review | [ ] Yes | [ ] No | Date | _____ |
| Sketch Review | [ ] Yes | [ ] No | Date | _____ |
| Major Review | [ ] Yes | [ ] No | Date | _____ |
| Final Review | [ ] Yes | [ ] No | Date | _____ |
| Landscape Design Review | [ ] Yes | [ ] No | Date | _____ |

Signed Application on file dated _____

Date deposit received _____   Date deposit returned _____

Approved by _____
            *Chair of the REVIEW COMMITTEE*

Signature _____        Date _____

This application form must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting. Consult WARC.

Submit to:   Windsor Architectural Review Committee
             3125 Windsor Boulevard
             Vero Beach, Florida   32963

*(Cut here)*

# FORM G

## REQUEST FOR FINAL INSPECTION

### TO BE COMPLETED BY THE OWNER AND THE BUILDER

OWNER _____     Block _____

                                            Lot   _____

Builder _____

License No. _____

Address _____

        _____

Telephone _____ Telefax _____

### REQUESTED DATE OF INSPECTION _____

I do hereby certify in good faith that on said Block and Lot the contracted structure conforms to the Construction Drawings approved by WARC and to *The Windsor Code*. All site work, including landscaping, cleaning up, removing of temporary utilities, and repairing of any damage to RIGHT-OF-WAY or common areas, has been completed. This constitutes a request for return of the construction deposit.

Submitted by _____

Signature _____     Date _____

Attached herewith are:

    [ ]  Final Certified Survey

    [ ]  As-Built set of drawings
        *(If WARC approved on-site changes vary from WARC approved construction drawings)*

    [ ]  Certificate of Occupancy

Signature of OWNER
to approve return of deposit _____     Date _____

Signature of
Construction Manager _____     Date _____

This application form must be submitted to WARC at least 7 days before WARC's scheduled monthly meeting. Consult WARC.

Submit to:  Windsor Architectural Review Committee
            3125 Windsor Boulevard
            Vero Beach, Florida   32963

*(Cut here)*

# WINDSOR ARCHITECTURAL REVIEW COMMITTEE

**A. Function of the Windsor Architectural Review Committee**

To contribute to the architectural harmony of Windsor, the developer and all property OWNERS must comply with the regulations defined in the Windsor Community Association's *Declaration of Covenants, Conditions, and Restrictions for Windsor* and the requirements contained in *The Windsor Code.* To that end, no structure shall be erected or altered until the proposed site plan, building plans, and construction materials have been approved by the Windsor Architectural Review Committee (WARC or the REVIEW COMMITTEE).

**B. Scope of Responsibilities**

WARC has the right to exercise control over all construction in the Windsor community. It will also review all alterations and modifications by OWNERS to existing structures, such as walls, painting, renovations, and landscaping, which are visible from the STREET and neighboring residences.

**C. Enforcement Powers**

Should a discrepancy with *The Windsor Code* actually be built, WARC has the right to file an injunction requiring the OWNER to stop, remove, and/or alter any element, material, or configuration that does not comply with the standards established by WARC. Approval by WARC does not relieve an OWNER of his or her obligation to receive any government approvals, if required. If such approvals are required and are not obtained by the OWNER, WARC and/or the applicable governmental agency may take whatever action is necessary against the OWNER to obtain compliance.

**D. Limitation of Responsibilities**

The primary goal of WARC is to review submitted applications, plans, specifications, and materials for the proposed structure's conformity with the appearance and construction criteria of *The Windsor Code* as set forth by WARC. WARC does not assume responsibility for the following:

1. The structural adequacy, capacity, or safety features of the proposed structure or improvement
2. Soil erosion, non-compactible or unstable soil conditions
3. Compliance with any or all building codes, safety requirements, government laws, regulations, or ordinances
4. Performance or quality of work of any contractor

**E. Committee Members**

WARC shall consist of individuals appointed by the developer, Windsor Properties. The developer has the right to appoint all WARC members who shall serve at the discretion of the developer. At a later date, the developer may assign this right to the Board of Directors of the Windsor Community Association, Inc. The Association may retain the services of architects to act as consultants to WARC.

**F. Administration**

WARC may appoint an administrator to handle the day-to-day responsibilities of processing submissions and coordinating communications with OWNERS.

**G. Meetings of the WARC**

WARC will meet monthly. Approvals or other responses from WARC must be made within 30 days of the date the request is received by WARC. The failure of WARC to meet or respond to a submission made by an OWNER within 30 days does not constitute an approval.

**H. Minutes of the WARC Meetings**

All decisions by WARC will be recorded in minutes taken at the WARC meetings. Although OWNERS will not be present at these meetings, recorded minutes of each meeting will be available on request. The WARC minutes will include decisions by WARC and the rationale behind those decisions. The rationale can be used in making future decisions. Plans and specifications will be retained by WARC as part of the

**I.  Review Fees**
Review fees will be established and published by WARC. WARC reserves the right to waive these fees for a period of time at their discretion.

**J.  Application Withdrawal**
An application for withdrawal may be made without prejudice, provided the request for withdrawal is made in writing and filed with WARC before the review and/or action of the application.

**K.  Variances**
All requests for elements, materials, and configurations at variance with *The Windsor Code* must be made in writing to WARC, which shall act on such requests pursuant to the provisions of Article XI, Section 4 of the *Declaration of Covenants, Conditions, and Restrictions for Windsor*. WARC also reserves the right (but is not obligated) to consult with adjacent or nearby lot OWNERS who may be affected by the variance request.

**L.  Appeal**
If an application has been denied, or the approval is subject to conditions which the OWNER feels are unacceptable, the OWNER may request a hearing before the full REVIEW COMMITTEE to explain his/her position. WARC will review its decision and notify the OWNER of its final decision within 10 days of the hearing.

**M.  Approval of Builders**
All builders must be approved by WARC to build in the Windsor community. A list of pre-approved builders is available from the Windsor administrative office. If the OWNER is considering a builder not on this list, a specific approval process must be followed. A separate *Builder's Guidelines Manual & Application* is available on request.

**N.  Construction Deposit**
For each house under construction, a construction deposit is required from its builder. The deposit check, written in the amount as noted on *Form F: Application to Start Construction* and made payable to the Windsor Architectural Review Committee, must accompany *Form F* before beginning construction. The deposit shall be held by WARC until a final survey, certificate of occupancy, and final field inspection have been made by WARC. Full compliance will result in the return of the construction deposit. If the deposit is needed to repair, replace or clean up common areas damaged as a result of construction activities, the builder will be notified 24 hours prior to the use of the deposit, allowing the OWNER to rectify the problem before the deposit is expended.

**O.  Construction Inspections**
Periodic inspections may be made by WARC while construction is in progress to determine compliance with the approved plans and specifications. WARC is empowered to enforce its policy as set forth in *The Windsor Code* and the Windsor Community Association's *Declaration of Covenants, Conditions, and Restrictions for Windsor* by any action, including an action in a court of law, to ensure compliance.

**P.  Design Document Changes and Minor Changes**
The OWNER must notify WARC before making any changes to the approved plans. A letter with support data and drawings, if applicable, must be submitted to WARC. Any major deviations (as solely determined by WARC) may require full WARC approval before implementing the changes. Upon completion, an as-built set of drawings is required.

**Q.  Waiver and Additional Requirements**
*The Windsor Code's* REGULATING PLAN, ARCHITECTURAL STANDARDS, BUILDING PLACEMENT STANDARDS, and LANDSCAPING STANDARDS have been developed to assist lot OWNERS and the REVIEW COMMITTEE with the ARCHITECTURAL REVIEW PROCEDURE. However, if deemed necessary, WARC has the right to waive any of the requirements set forth herein, or has the right to require additional or more stringent requirements regarding any proposed improvement.

# WINDSOR PROPERTIES

## A FLORIDA GENERAL PARTNERSHIP

# WARC BUILDING PERMIT

**THE CONSTRUCTION PLANS FOR THIS BUILDING HAVE BEEN APPROVED BY THE WINDSOR ARCHITECTURAL REVIEW COMMITTEE**

OWNER _____     Block _____

Builder _____     Lot   _____

License No. _____

Contact _____

Dates the required reviews and design phases of the ARCHITECTURAL REVIEW PROCEDURE were successfully completed:

| | | | |
|---|---|---|---|
| Pre-Design Code Review | [ ] Yes | [ ] No | Date _____ |
| Sketch Review | [ ] Yes | [ ] No | Date _____ |
| Major Review | [ ] Yes | [ ] No | Date _____ |
| Final Review | [ ] Yes | [ ] No | Date _____ |
| Landscape Design Review | [ ] Yes | [ ] No | Date _____ |

Approved by _____     Date _____

*The TOWN-PLANNER for the REVIEW COMMITTEE*

This permit must be posted in a conspicuous location visible from the STREET and protected from the elements.

Windsor Architectural Review Committee
3125 Windsor Boulevard
Vero Beach, Florida   32963

**EXHIBIT 3**

JORGE L. HERNANDEZ
Architect

June 25, 2004

Mr. Luis VanCotthem
3125 Windsor Boulevard
Vero Beach, Florida 32963

RE:     Darretta Residence                                    Sketch Review
        Block 15 / Lot 1 & 2

Dear Luis:

The following is a response to your letter dated June 8th 2004.  For clarity I have copied
passages from your letter in *italics* and then inserted my response in **bold type**.

**STATEMENT:**
> *First, please allow me to clarify that your assumption regarding the required 60*
> *linear feet of loggia along the required built-to-line on the North side of the*
> *property is fulfilled is not correct.  Furthermore, to assume that compliance will*
> *be achieved by combining a 42'-8" by 8' loggia with a 12' by 7" one placed*
> *sideways (the short side along the required line) and a pergola is simply*
> *erroneous.  As it was expressed both verbally and throughout our*
> *correspondence, we believe that this is one of the fundamental points to be*
> *complied with in a straightforward manner.*

**ANSWER:**
**Since the inception of this project, numerous times you have represented to Mr.
Darretta, Mrs. Darretta and to me (once during a conference call) that a double lot,
which requires 60'- 0" linear feet of porch or loggias would be given some flexibility
to that rule.  Please see your comments in paragraph "3" of your letter summarizing
the conference call of February 13, 2004.  We have a loggia in the garden which is
now 44'- 10" along the built-to-line and a kitchen porch which is 11' – 7"along the
built-to-line.  The total is 56' – 2".  There is also a guest house pergola, 11' 0" long
and a carriage house pergola 58' 0" long which total 69' 0" on the built-to-line.
There is a non-complying ground floor loggia (ground level of carriage house) that
is 32' 0" long on the built-to-line.  These other structures total 101' 0" in length.
The Jacobson designed house nearby and other structures comply with this
requirement by using separate structures which are considered together to fulfill
this requirement and you have repeatedly stated to the owners as well as to me, that
in other cases pergolas have been counted towards this requirement.  In summary,
the garden loggia and kitchen porch total 56'- 2" (3'- 10" short of 60' – 0").  We also
have 101' 0" of other pergolas or loggias at the built-to-line.  Are you rejecting this**

337 Palermo Avenue • Coral Gables, Florida 33134
Office: (305) 774-0022 • Fax: (305) 774-0055
Florida AR #9843 • Virginia AR #5765 • Georgia AR #9273 • South Carolina AR#5689

1

submittal because we are 3' – 6" short of the 60 linear feet or because we are accomplishing this requirement with two structures?  Secondly, are you giving us no consideration for the 101' 0" length of other pergolas and the non-complying loggia along the built-to-line?  Are the Darretta's being given no consideration for a double lot?  Please clarify.  This treatment seems incongruous with the way other projects were dealt with and, quite frankly, even different from your previous advice.

## STATEMENT:
Variances Requested:
1. To built (4) 6' high masonry walls on the south and west setbacks of the lot. **Granted.**

## ANSWER:
**Features remain**

## STATEMENT:
2. To allow (4) windows on the second floor of the Main house to be closer than 3 feet from the edges of the building.  Will not be granted.

## ANSWER:
**Windows have been reconfigured to comply**

## STATEMENT:
3. To allow a roof terrace as configured in the plans.  Deferred until other compliance issues are resolved.

## ANSWER:
**All other compliance issues have now been addressed.  We await your decision on this matter which is of central importance to the massing and basic concept of this project.  As I have stated in numerous letters and discussions until we are given a sketch review approval for "Substantial Compliance" with this feature in place it is fruitless to develop the project any further.**

## STATEMENT:
Height:
_Items not complying with Windsor Code_:
Proposed slope of the roof for the entry hall linking the Master bedroom to the rest of the Main house on the south side does not meet the minimum 7/12 ratio required by the Windsor Code.  In addition, its eave depth is smaller than the 20-inch minimum allowed in Windsor for ancillary structures.  Please reconfigure as required (**).

**ANSWER:**
**The pitch of the roof for the entry hall to the Masters bedroom was 7' – 12" and remains 7' – 12".  The eaves depth is now at 20".**

**STATEMENT:**
*Items Require Clarification:*
*It is difficult to determine the slope of all roofs of the house.  Please clarify (\*\*)*

**ANSWER:**
**All roofs slopes are according to code.**

**STATEMENT:**
*Siting:*
*Items not complying with Windsor Code:*
*Proposed pedestrian entrance on the south side of the lot must be maximum 6 feet in width, as stated by the Building Placement Standards.  Please reconfigure it to comply (\*) & (\*\*).*

**ANSWER:**
**The southern entrance was made 8' – 0" wide as per your suggestion in the letter of November 4, 2003 under *Siting Items 4 – B*.  At the time, we both agreed that this would give greater import to the southern entry.**

**STATEMENT:**
*Items Requiring Clarification:*
*Proposed Hedge along entire length of the south and west boundaries of the lot must be 6 feet in height.  Please clarify (\*\*).*

**ANSWER:**
**Proposed hedge is noted as such in the plans on the east side.  The hedges shown on the south and west sides have now been noted as well, to be 6' – 0"high**

**STATEMENT:**
*The Committee is concerned with how the landscape area at the south east corner of the lot will be maintained since no apparent access point is drawn.  Please clarify.*

**ANSWER:**
**A small parting in the hedge is now shown for maintenance purposes.**

3

**STATEMENT:**
> *Elements:*
> *Items not complying with the Windsor Code:*
> *The following openings are closer than 3 feet from the edge of the buildings and, they must be reconfigured to comply (\*), (\*\*) & (\*\*\*):*
> *Main House:*
> *Northernmost French door on the west elevation of the Master suite.*

**ANSWER:**
**This door is not visible from the street or the golf course and therefore according to code can be less than 3' – 0" from the corner. We discussed this with the Darretta's during the February 13, 2004 conference call and you agreed that this opening was not visible from the golf course or street. Your minutes of the conference call dated March 4, 2004 refer to this in the paragraph numbered "2".**

**STATEMENT:**
> *Windows (4) at the North and South corners of the house.*

**ANSWER:**
**A variance was requested for this feature and was denied in your letter of June 8, 2004. This has been reconfigured to comply with the code.**

**STATEMENT:**
> *Carriage House:*
> *Garage opening on the East elevation.*

**ANSWER:**
**A wing wall has been added to displace the garage opening from the corner of the building. When measured, the distance between the two exceeds the minimum 3' 0" distance.**

**STATEMENT:**
> *Panels of glass (lites) of most windows transoms and doors are bigger than 18 inches horizontally by 29 inches vertically, which is the maximum dimension allowed by the Windsor Code. Please reconfigure (\*\*)*

**ANSWER:**
**All windows, doors and transoms have been subdivided so that the pattern of lites complies with the code. Given the scale of the drawings required for sketch review it is difficult to exactly measure the lites at this time. A window and door manufacturer has not been selected yet and therefore the width of the muntins and styles are not known. All window, door and transom lites will comply with code.**

4

**STATEMENT:**
>   *Proposed eave depth of loggia linking the Carriage house and the Main house
>   and corridor linking Master Suite with the rest of the Main house is smaller than
>   the minimum 20 inches allowed by the Windsor Code.  Please reconfigure (\*\*).*

**ANSWER:**
It has been reconfigured and is now 20" deep.

**STATEMENT:**
>   *Loggia or Porch length provided (42'-8") along the required Built-to-Line on the
>   north side of the property does not meet requirement for a double lot.  Please
>   reconfigure to comply (\*\*), (\*\*\*) & (\*\*\*\*).*

**ANSWER:**
Please refer back to page 1 statement and answer.

**STATEMENT:**
>   *Proposed pediments roofs on the East Side of the guesthouse and the North and
>   South sides of the main house are not allowed by the Windsor Code.  Therefore,
>   they have to be reconfigured to comply (\*).*

**ANSWER:**
These elements were developed with your counsel after the November 4, 2003 letter.
They were developed as gables, not pediments.  The two gables on the guest house
were reconfigured (changed from pediments to gables).  The two gables facing north
and south on the main house were added with your counsel to address the facing of
Savannah and the Golf Course.  If you refer to the original submittal, you will see
that these gables were not then part of the design.

Gables (the most prominent being the large scale gable of the Cape Dutch style
house near the Darretta project) are permitted by code.  *The Oxford Dictionary of
Architecture* defines a gable in contrast to a pediment as follows:

- Gables are generally more steeply pitched (the 7/12 required roof pitch
  exceeds the lower classical pitches ranging around 3/12).

- Pediments have both raking and horizontal cornices, with the horizontal
  cornice configured as a full classical entablature.

- The pediment produces a tympanum.  The gable does not.

Therefore, these elements are gables.

**STATEMENT:**
*Items Requiring Clarification:*
*Openings facing North and West located at the room labeled as "Porch" on the second floor of the Carriage house feature sliding doors, please notice that only French doors are allowed at Windsor. Please clarify (\*\*).*

**ANSWER:**
These are sliding French doors. They are sliding doors which contain glass lites.

**STATEMENT:**
*We are concerned that there still are 3 different types of design on the plans (\*\*).*

**ANSWER:**
Yes, there are three different types of eaves. These will be further developed and detailed after sketch review. The scale of the drawings required at the sketch review does not allow for detailing of small scale architectural elements. When they are further developed they may be made similar or complimentary. The intent is to have them work together to accentuate the importance of the main house eaves.

**STATEMENT:**
*Configuration and material of cornices of all buildings, including the proposed frieze on the second floor of the Main house (\*\*)*

**ANSWER:**
Configuration is shown in the drawings to the degree that the scale appropriate and required for sketch review allows. The materials planned for the entire house are stucco walls, wood eaves, zinc coated copper or cedar shake roofs and coral stone for the pool and some garden walls as shown.

**STATEMENT:**
*Roof material (\*\*).*

**ANSWER:**
Please see previous answer.

**STATEMENT:**
*Additional Comments:*
*The amount of proposed ancillary structures with small eaves is reversing the intent of the Windsor Code where the Main house is the dominant element of the composition and the other structures are smaller and subordinate to it.*

6

**ANSWER:**

1. The eaves of all ancillary structures have been reconfigured to have a depth of at least 20", which is code.

2. The number of ancillary structures in the current plan is unchanged from the first submittal in October of 2003.

3. I believe this massing precisely satisfies the Windsor Code in establishing the reading of the main house and subordinate ancillary structures.

4. The comments regarding the massing in your November 2003 letter states: "The proposed Villa features very desirable urban and architectural elements such as its private street and courtyard...." This effect is directly achieved from the number and placement of ancillary structures in relation to the main house. Furthermore, the second part of your comments in that same letter addressing the facing of the house is what caused us to add, in consultation with you, the north and south gables to the main house and the second story loggias addressing the golf course and Savannah on the main house.


**STATEMENT:**
> *Please give further thought to the aspect of your general composition, making sure that a scale model of the entire house is included with your next submission. Please resubmit addressing the stated contingencies, observing that the Committee reserves the right to make further comments necessary to ensure compliance on future submissions.*

**ANSWER:**
I believe we have addressed all the comments in your letter of June 8, 2004 to the point where sketch review approval should be granted. You are in possession of a model for the project which you have had since October of 2003. This model is not current because in developing the design to address your previous comments certain details of the project have changed; (for example the north and south gables in the main house have been added to the project since the model was made), nevertheless the project is substantially unchanged in terms of its massing. This set of drawings and the model, when reviewed together, give a clear reading of this project. Moreover, a model (although you have one) is not part of the sketch review submittal requirements. The Darretta's would rather not incur the expense of revising the model you have for a sketch review approval. If you disagree with this please clarify in your response.

I look forward to your response.

Sincerely,


Jorge L, Hernandez
Architect











SAVANNAH PLACE

ROOF PLAN

JORGE L. HERNANDEZ
Architect



COURT YARD ELEV. MAIN HOUSE

COURT YARD ELEV. MAIN HOUSE

MAIN HOUSE FRONT TOWARDS VIA

JORGE L. HERNANDEZ
Architect





GARDEN SECTION

GOLF FACADE

JORGE L. HERNANDEZ
Architect
137 Palermo Avenue Coral Gables, Florida 33134 (305) 774-0922

SAVANNAH FACADE

JORGE L. HERNANDEZ
Architect

337 Palermo Avenue, Coral Gables, Florida 33134 (305) 774-0022

JS-44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purposes of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**
ROBERT J. DARRETTA and MARYELLEN DARRETTA

**DEFENDANTS**
WINDSOR PROPERTIES, a Florida general partnership, and TORWEST, INC., a Florida corporation, as general partner of WINDSOR PROPERTIES

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Mercer County, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Indian River
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Gunster, Yoakley & Stewart P.A., 777 S. Flagler Drive, Suite 500E, West Palm Beach, FL 33401;
561-655-1980; fax 561-655-5677

ATTORNEYS (IF KNOWN)

*04-14244*
*04CV14244 DMM EJL*
*CIV-MIDDLEBROOKS*
*MAGISTRATE JUDGE*

**(d)** CHECK BOX FOR COUNTY WHERE ACTION AROSE: ☐DADE ☐MONROE ☐BROWARD ☐PALM BEACH ☐MARTIN ☐ST. LUCIE ☒INDIAN RIVER
☐OKEECHOBEE ☐HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN X ONE BOX ONLY)

☐ 1. U.S. Government (Plaintiff)

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government (Defendant)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF (FOR DIVERSITY CASE ONLY) AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizens of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☒4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒1 Original Proceeding
☐2 Removed from State Court
☐3 Remanded from Appellate Court
☐4 Reinstated or Reopened
☐5 Transferred from another district (Specify)
☐6 Multidistrict Litigation
☐7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault. Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL INJURY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other personal Injury | ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing Accommodations | B☐ 530 General | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | | A☐ 535 Death Penalty | | A☐ 870 Taxes (U S Plaintiff or Defendant | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | B☐ 540 Mandamus & Other | ☐ 790 Other Labor Litigation | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | B☐ 550 Civil Rights | ☐ 791 Empl Ret Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

LENGTH OF TRIAL
Via. 5 days estimated (for both sides to try entire case)       28 U.S.C. § 1332(a)(1)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND in excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY:

(See Instructions): JUDGE_____  DOCKET NUMBER:_____

DATE: August 26, 2004

SIGNATURE OF ATTORNEY OF RECORD

*FLBar # 0169262*

**FOR OFFICE USE ONLY**
RECEIPT # *121103*  AMOUNT *$150.00*  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____